# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 19, 2015 Session

## STATE OF TENNESSEE v. DEVONTE BONDS, THOMAS BISHOP, JASON SULLIVAN, AND BRIANNA ROBINSON

### Appeal from the Criminal Court for Knox County
### Nos. 100194A-D    Bobby R. McGee, Judge

_____

### No. E2014-00495-CCA-R3-CD – Filed April 7, 2016

_____

Defendants Devonte Bonds, Thomas Bishop, Jason Sullivan, and Brianna Robinson were tried jointly and convicted of attempted second degree murder, aggravated assault, and possession of a firearm during the commission of a dangerous felony. The jury found that the underlying offenses committed by Defendants Bonds, Bishop, and Sullivan constituted criminal gang offenses, and they received enhanced punishment under Tennessee Code Annotated section 40-35-121. All of the defendants raise multiple procedural and evidentiary issues with regard to the guilt phase of the trial on the underlying offenses. Defendants Bonds, Bishop, and Sullivan also raise several issues regarding their criminal gang enhancements. Defendants Bishop and Sullivan each raise an issue with regard to their sentencing. After an exhaustive review of the record, we ascertain no error in the guilt phase of the trial on the underlying offenses. Accordingly, the trial court's judgment as to Defendant Robinson is affirmed. However, because the subsection of the criminal gang enhancement statute employed by the State violates the Due Process Clause of the Fourteenth Amendment and is facially unconstitutional, we reverse the judgments of the trial court as to Defendants Bonds, Bishop, and Sullivan, vacate the criminal gang enhancements, and remand for modification of the judgments and a new sentencing hearing on the underlying offenses of attempted second degree murder, aggravated assault, and possession of a firearm during the commission of a dangerous felony.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Reversed in Part, and Remanded

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

John M. Boucher, Jr., Knoxville, Tennessee, for the appellant, Devonte Bonds.

Wesley D. Stone (on appeal and at trial), Timothy Jones (on appeal), and Joseph A. Fanduzz (pre-trial), Knoxville, Tennessee, for the appellant, Thomas Bishop.

Leslie M. Jeffress, Knoxville, Tennessee, for the appellant, Jason Lamont Sullivan.

J. Liddell Kirk (on appeal) and Susan E. Shipley (at trial), Knoxville, Tennessee, for the appellant, Brianna Michelle Robinson.

Herbert H. Slatery III, Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Randall E. Nichols, District Attorney General; and Ta'Kisha Fitzgerald and Philip Morton, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This is a direct appeal by the four defendants who were convicted by a Knox County jury of various serious crimes of violence involving firearms and gang enhancement that resulted from a "beating out" of a fellow gang member. Because of the nature of the charges, the defendants were tried jointly in a trifurcated proceeding.

*I. Procedural History and Factual Summary*

All of the defendants were indicted for attempted first degree murder, aggravated assault, possession of a firearm during the commission of a dangerous felony, and employing a firearm during the commission of a dangerous felony. A jury convicted them of attempted second degree murder, aggravated assault, and possession of a firearm during the commission of a dangerous felony; they were acquitted of employing a firearm during the commission of a dangerous felony. Defendants Bishop and Sullivan were each found to have committed the underlying firearm offense while having previously been convicted of dangerous felonies. Defendants Bonds, Bishop, and Sullivan were found to have committed criminal gang offenses and received enhanced punishment pursuant to Tennessee Code Annotated section 40-35-121. The following facts were adduced during the guilt phase on the underlying offenses.[1]

---

[1] Relevant facts from the pre-trial proceedings and the other guilt phases for the enhancements will be provided during the analysis section of this opinion.

On May 30, 2012, Jonathan Dyer was living with his girlfriend, Carnisha Dibrell, in Arbor Place Apartments on Townview Drive. Katherine White lived upstairs from the couple in the same apartment complex. That morning, Ms. White asked Mr. Dyer to take out his trash because she could smell it at her apartment, and she gave him a trash bag to do so. Mr. Dyer removed the trash and cleaned off his porch. Afterward, around 11:00 a.m., he went inside to brush his teeth and to prepare for a job interview. He also woke up Ms. Dibrell so that she could get ready to go to work.

Ms. White was sitting on the stairs outside of her apartment and smoking a cigarette when she saw a group of people approach and knock on Mr. Dyer and Ms. Dibrell's front door. Mr. Dyer and Ms. Dibrell heard the knock on the door, and Mr. Dyer shut the bedroom door before going to answer the front door. When Mr. Dyer opened the door, the defendants immediately entered the apartment. Ms. White saw Mr. Dyer let the group inside the apartment.

Mr. Dyer and the defendants were members of a street gang known as the Five Deuce Hoover Crips. Mr. Dyer knew the defendants, primarily, by their gang monikers: Defendant Bonds was known as "Lil Doozie"; Defendant Bishop was known as "Hoova T"; Defendant Sullivan was known as "Crank Deuce"; and Defendant Robinson was known as "Yella Deuce." Mr. Dyer's gang moniker was "J Hoover." Mr. Dyer knew Defendant Bonds the best of all the defendants because they grew up together, and Defendant Bonds's legal name was the only one of which Mr. Dyer was aware at that time. Mr. Dyer had only met Defendant Sullivan recently.

After entering the apartment, Defendants Bishop and Sullivan told Mr. Dyer that he needed "to put some money on [his] big homey, L.G.'s, books." Mr. Dyer refused this demand on the basis that fellow gang member L.G. was not his big homey; Mr. Dyer's big homey was another individual.[2] Mr. Dyer explained that a "big homey" is a gang member who "calls the shots." A gang member under the authority of a "big homey" is

---

[2] Gang expert Detective Thomas Walker later testified that Lamar Griffin was affiliated with the Five Deuce Hoover Crips. According to Detective Walker, his street name is "L.G.," and he was incarcerated on May 30, 2012, which was a Wednesday. That day was Mr. Griffin's designated day of the week to use money from his account to place an order for amenities from the jail's commissary. People on the outside can deposit money into an inmate's account. An order for the commissary would have to be placed by around noon on the same day. It is processed overnight, and the goods are delivered the next day. If there are insufficient funds in the account, the order is not filled.

called a "little homey," and a little homey must get the big homey's permission "to do something."

Defendant Bishop then accused Mr. Dyer of abandoning Defendant Robinson during a previous incident when someone fired a gun at her. Defendant Bishop indicated that Mr. Dyer's conduct was unacceptable because he had "left the home girl on stuck," meaning that Mr. Dyer "didn't defend her." Mr. Dyer maintained to the group that such an event had never happened and told them that Defendant Robinson was lying. Defendant Robinson "swore up and down that it did happen" and insisted, "Yeah, it did. You left me on stuck." Defendant Bishop reprimanded Mr. Dyer, chiding "these are the most precious things to us. You're supposed to hold it down, cuz. That's bogus." In making mention of "the most precious things," Defendant Bishop was talking about all female Crips. Mr. Dyer explained that, as a gang member, he was expected to "step up" and defend a fellow gang member if being threatened. Thus, if Defendant Robinson had been attacked, he would have had an obligation to protect her.

While in the bedroom during the confrontation, Ms. Dibrell heard a familiar male voice say, "These are the most precious B's in the world. . . . You ain't supposed to leave them like that. [They] are supposed to be protected." She then heard Mr. Dyer deny the accusations by responding, "No, that ain't what happened. That ain't what happened."

According to Mr. Dyer, failing to provide money for an incarcerated inmate and failing to protect a fellow female gang member could be potential grounds for a gang member to be expelled from the gang. The group surrounded Mr. Dyer against the wall leading into the kitchen of his apartment, and all of them "ganged" him, which meant that Mr. Dyer was "getting hands and feet put to" him. Mr. Dyer explained that receiving a gang beating or a fight is both the manner of initiation into the gang and expulsion from the gang. These rituals are known as "ganged in" and "ganged out." Mr. Dyer was ganged in to the gang when he was seventeen years old. During his initiation, Mr. Dyer was only ganged with fists, not feet, and he fought back against the gang members who were "jumping" him. There were no weapons during the initiation. Mr. Dyer did not need medical attention after he was ganged in. For this particular gang, the beating or fight is supposed to last for two minutes. However, on this occasion, Mr. Dyer did not remember having "too much of a chance to fight back." Mr. Dyer acknowledged that the beating he received was him being "ganged out" of the Five Deuce Hoover Crips and that he is no longer a member of the gang. Mr. Dyer testified that a gang member is also expected to fight back when he is ganged out. He was unaware of any gang member sustaining injuries as serious as he did while being ganged out.

Mr. Dyer remembered that Defendant Sullivan had a pistol "inside his front pocket," which Mr. Dyer described as a "little .22." Mr. Dyer could see the handle "hanging out," and he recognized the gun as belonging to Defendant Robinson. However, Mr. Dyer did not see Defendant Sullivan remove the weapon from his pocket, and as far as he knew, he had not been "pistol-whipped" with the gun.

From the bedroom, Ms. Dibrell heard a man "screaming" at Mr. Dyer, followed by loud yelling. The voice was so loud that Ms. Dibrell was "scared . . . a little bit." After "no longer than five seconds" of "scuffling" and "commotion," Ms. Dibrell went into the living room and saw Mr. Dyer on the floor. At that point, he was no longer being beaten. When Ms. Dibrell entered the room, four individuals were looking at her, and she began to "fear for [her] life."

The attackers walked out of the apartment, but Defendant Bonds turned around and pushed his way back into the apartment as Ms. Dibrell tried to shut the front door. He retrieved a bottle of Sprite from the kitchen and left. Ms. Dibrell did not observe any of the attackers carrying a weapon of any type.

Out of the group, Ms. Dibrell recognized Defendant Bonds because she knew him well. She had seen Defendant Bishop at their apartment on previous occasions, but only knew him by his moniker. Ms. Dibrell gathered that the familiar voice she had heard in the bedroom was that of Defendant Bishop because she knew it was not Defendant Bonds's voice and because she did not know the other male in the group. The first person who walked out of the front door did not appear to be someone Ms. Dibrell knew, but she did not see that person's face.

Mr. Dyer was face down on the floor and would not respond to her. There was "so much blood on his face." His toothbrush was on the floor in the living room. Afraid that the attackers might still be outside, Ms. Dibrell said a prayer before she went outside and began screaming. She ran upstairs to get help from Ms. White and the other neighbors. Ms. Dibrell was "so scared" about Mr. Dyer's condition because he was unconscious and could not be roused.

Ms. White was still outside when Ms. Dibrell came out of the apartment screaming. Ms. White estimated that less than a minute had elapsed since the group entered the apartment. However, Ms. White did not notice the group leave. Ms. White went down to the apartment, looked inside through the front door, and saw Mr. Dyer on the floor.

After alerting Ms. White, Ms. Dibrell returned to her apartment and observed Mr. Dyer begin "shaking." She then called 911 from her apartment. Paramedic David Blanton responded to the emergency call. After entering the apartment, he observed Mr. Dyer unconscious on the floor and bleeding from his head. Mr. Dyer would not respond to attempts to revive him. Paramedic Blanton and his partner immobilized Mr. Dyer and carried him on a stretcher to their ambulance. They took him to the emergency room for trauma patients in critical condition.

The beating rendered Mr. Dyer unconscious and caused him to have body seizures. He remained in a medically-induced coma for nine weeks. A tracheotomy tube was inserted into Mr. Dyer's throat because he could not breathe without mechanical assistance. He needed rehabilitation to learn how to talk and walk again and to learn how to control his excretory functions. Mr. Dyer said that he was not in his "right state of mind" immediately after awaking from the coma. He began "hitting people" after he regained consciousness. Ms. Dibrell admitted that there were moments when Mr. Dyer's memory was "spotty" after he regained consciousness. At times, he did not recognize her. Mr. Dyer eventually normalized, but there are still some things that he does not remember. Mr. Dyer agreed that there are gaps in his memory about what happened to him after he awoke from the coma. At the time of trial, Mr. Dyer was twenty-one years old.

Michael Washam of the Knoxville Police Department was an investigator in the Violent Crime Unit. When he arrived at Mr. Dyer's apartment, Mr. Dyer had already been taken to the hospital. Inside the apartment, Investigator Washam observed puddles of blood near and inside of the kitchen area.

Investigator Washam interviewed Ms. White about the incident and spoke to the apartment manager. Based on his conversations, Investigator Washam began looking for four black males and a black female. Ms. White testified that the men entered first, followed by the woman. The woman wore her hair in a ponytail. One of the other men had a short "fade" haircut. They did not appear to be carrying anything. Investigator Washam quickly identified Defendants Bonds and Robinson as potential suspects; Defendant Bishop became a suspect not long after the first two were identified as suspects.

On July 20, 2012, Investigator Washam went to the hospital and showed Ms. Dibrell a six photograph lineup. She identified Defendant Bishop. He showed her another six photograph lineup, and she identified Defendant Bonds. At the time she made those identifications, she had not discussed the incident with Mr. Dyer.

During this hospital visit, Mr. Dyer was "up and moving around . . . [but] he did not know who he was nor who [Investigator Washam] was and could not even name his girlfriend's name . . . ." Because of Mr. Dyer's mental state, Investigator Washam did not ask Mr. Dyer to identify his attackers.

On August 20, 2012, Investigator Washam returned to the hospital and presented Mr. Dyer with several six photograph lineups. Investigator Washam instructed Ms. Dibrell to leave the room while he asked Mr. Dyer about the lineups. Mr. Dyer identified Defendants Bonds, Robinson, and Bishop, respectively. Mr. Dyer did not make an identification in two additional lineups, neither of which contained a photograph of any of the defendants. He told Investigator Washam that Crank Deuce participated in the beating and that one of the men in the two lineups looked like Crank Deuce. However, because Mr. Dyer had only met Crank Deuce once or twice a few weeks before the beating occurred, Mr. Dyer said that he was "not a hundred percent sure" that Crank Deuce was in the lineups. Mr. Dyer asked Investigator Washam to bring additional lineups for him to review. Separately, Ms. Dibrell also identified Defendant Robinson in a lineup.

On August 25, 2012, after Mr. Dyer had been released from the hospital, Investigator Washam showed Mr. Dyer a different lineup. This time, Mr. Dyer affirmatively identified Defendant Sullivan as Crank Deuce.

On October 22, 2012, Investigator Washam showed Ms. White a six photograph lineup, and she identified Defendant Robinson. He showed her another lineup, and she identified Defendant Bishop. She could not identify anyone else in the group.

Detective Thomas Walker of the Knox County Sheriff's Office testified that Five Deuce Hoover Crips is a gang that operates in Knox County. The Hoover Groovers was the original gang name during the 1960s in California. The gang members commonly refer to the gang as "Groovin'" or "Groovers." Detective Walker confirmed that, in gang culture, a member known as "a big homey" is one who recruits members to the gang. The recruits are mentored or trained on gang life by the "big homey." The more recruits a "big homey" has, the more status he has within the gang. Aside from death, "beat outs" are a common way for gangs to expel or release members who want to leave. It is a "very violent" experience that "will result in some kind of major trauma" to the ex-member. Permanent injury serves as an enduring reminder of what happens if someone offends or forsakes the gang.

The Sheriff's Office keeps a log of all ingoing and outgoing mail to inmates in their custody. On December 14, 2012, at 4:50 a.m., a letter written by Defendant

Sullivan was mailed to a Knoxville address.  Defendant Sullivan signed the letter identifying himself as "Crank Deuce 52."  Previously, on January 22, 2010, Defendant Sullivan sent another letter to the same individual.  The bottom of the letter displays the word "groovin" and the letters "MxHxL."  The acronym stands for "much Hoover love."  It is signed by "Crank Deuce."  Defendant Bishop signed a letter as Hoova T, "Hoova" being short for Hoover.

Defendant Sullivan has a tattoo on his arm.  It depicts four playing cards fanned out, each bearing the numeral two with one of the suits in a standard deck of playing cards; such a hand is known as a four of a kind.  The tattoo reads "Deuce is Wild."  The gang members also commonly refer to themselves as "The Deuces."  Defendant Bishop has the phrase "Criminal Minded" on his forearms as well as a five on one forearm and a two on the other.  Defendant Bonds has a tattoo on his neck that says "Five Two."  The numbers allude to their gang's name which contains those numbers.  Defendant Bonds also has a tattoo of a star, which in gang culture identifies that a gang member is with a particular "nation."  Defendant Robinson has "Yella Girl," tattooed on her neck.

Lieutenant Stephen Patrick of the Knox County Sheriff's Office testified that he was the keeper of records for the jail.  He explained that Knox County contracts with a private company to record and store all inmate telephone calls.  Every inmate receives a twelve-digit pin number, which is required for the inmate to place a phone call.  The phone pin number is associated with the inmate's identification number.  The State played portions of numerous recorded phone calls made by the defendants while incarcerated.[3]

On August 20, 2012, at 9:13 a.m., Defendant Bonds made a phone call to an unidentified recipient, during which he said:

> ["Tone"] keep telling everybody I'm locked up for attempted murder like he want[s] me to be locked up for attempted murder.  I said to myself like, "Dude, you just don't know.  Lil' Jonathan done woke up." . . . . If he were to press charges it would be aggravated assault and battery.  Ain't no attempted murder. . . .  Only thing is it would be extremely aggravated assault.

---

[3] For the sake of brevity, we have only summarized the most probative of these phone calls for purposes this opinion.

On February 28, 2013, at 6:40 p.m., Defendant Bonds made a phone call to an unidentified recipient, during which the following conversation transpired:

Defendant Bonds: Listen. Listen. I need you all to make sure cuz is not coming.

[Redacted]

Defendant Bonds: You got to make sure everything is everything, man. 'Cause if not, dude, I'm gone. I'm gone. I'm just gonna be gone for six years, but that's still a long time, man.

. . . .

Defendant Bonds: . . . . If he show[s] up, I'm gone for six years.

Other: (Inaudible)

Defendant Bonds: You hear me?

Other: Yeah. [Redacted] said he wasn't.

Defendant Bonds: . . . . I need to know. I can't say too much over the phone, you hear me?

Other: I know, okay. So you need to talk to your daddy.

Defendant Bonds: I'm telling—Look. Listen.

Other: I[] know what you're sayin', okay?

Defendant Bonds: All right, I'm just making sure. Because if everything go good, I will be walking. I will be walking out [of] this jail on April 23rd.

Other: Right.

Defendant Bonds: Yeah, got to get this politicking the right way. Got to get this stuff right, ASAP. 'Cause if everything go

good, I'm walking out that courtroom. My lawyer said, if cuz don't show up to court, I'm walking out that courtroom [on] April 23rd. I'm walking out of this jail [on] April 23rd. . . .

. . . .

Defendant Bonds: Yeah, my lawyer says, [if] Jonathan don't show up to court, I'm walking out of this court, I'm walking out of this jail [on] April 23rd.

Other: Oh, okay.

. . . .

Defendant Bonds: Hey, you coming to court, right?

Other: . . . . I'm gonna try. Yeah, I'm gonna tell my manager to approve it.

Defendant Bonds: He need to approve it 'cause I need you there. 'Cause when I walk into the courtroom, I need you to nod your head yeah if he there, you know what I'm saying? You hear me?

Other: Uh huh.

Defendant Bonds: 'Cause you coming in from the outside, and you can see, you get what I'm saying?

Other: Uh huh.

Defendant Bonds: All right. And if he not there, you know, nod your head no 'cause I can't talk to you. But don't make it obvious. I'm gonna look at you.

On February 28, 2013, at 6:53 p.m., Defendant Bonds made a phone call to an unidentified recipient, during which the following conversation transpired:

Defendant Bonds: I been calling your phone. Is my daddy there?

-10-

| | |
|---|---|
| Other: | No, he left. . . . |
| Defendant Bonds: | Ahh, damn.  I just missed him. |

. . . .

| | |
|---|---|
| Defendant Bonds: | . . . . I need him to make sure cuz don't show up. |

. . . .

| | |
|---|---|
| Defendant Bonds: | . . . . If cuz don't show, man, it's good.  But if he show, I'm gone for six for aggravated assault and then they gonna charge me six for another gun, which is at a hundred.  I'm gonna end up doing at least eight, nine years. . . . |

On March 4, 2013, at 9:45 a.m., Defendant Bonds made a phone call to his father, known to Mr. Dyer as "Big Doozie," during which the following conversation transpired:

| | |
|---|---|
| Defendant Bonds: | . . . . I was telling you to let you know and make sure cuz doesn't show up to court.  'Cause if [he] do, I'm gone for twenty years, man. . . . |

. . . .

| | |
|---|---|
| Defendant Bonds: | . . . . See, n[*****] is gonna talk.  See, he's gonna talk. . . . |
| Other: | . . . . You dude ain't coming to court, know what I mean? |
| Defendant Bonds: | Dude ain't coming to court, and I'm good, man.  I go to trial next month on April 23rd. |
| Other: | Well, he ain't showed up when he's supposed to. |

On January 5, 2013, at 7:46 p.m., Defendant Bishop made a phone call to an unidentified recipient, during which the following conversation transpired:

-11-

Defendant Bishop: Hey, you get your letter from the homey?

Other: Yeah, I been trying to look for that n[*****], man. I couldn't even find that little n[*****].

Defendant Bishop: You got that letter though?

Other: Yeah.

. . . .

Other: . . . . I've been trying to get in to little dude. . . . I mean, he was on Facebook. He was on Facebook so I was his friend on—I got into his friend on Facebook, and he's telling somebody he trying to heal or some s*** you know what I'm saying? He's trying to recover or something.

Defendant Bishop: All right, all right. Well, you got him on the issue?

Other: I ain't want to do it on Facebook, man.

Defendant Bishop: All right. . . . So, you on it then?

Other: I'm on it. . . .

. . . .

Other: Yeah, I'm trying to see where he is, see where he located at or not, so I can go just go to his crib.

Defendant Bishop: Yeah, that's what's up.

On March 23, 2013, at 3:34 p.m., Defendant Bishop made a phone call to the same phone number, during which the following conversation transpired:

Defendant Bishop: Hey, hey, what's up, man? Yeah, you still be acting on that little situation?

Other: Yeah. Lil Cuz, J Hoover.

-12-

. . . .

Defendant Bishop: What's up with them, homey?

Other: I don't know. Motherf[*****], said he wouldn't [be] coming though. Said he wouldn't [be] coming[, that is] what's up. And I talked to K Groove, and K Groove said he wasn't coming too though.

In a phone call on January 23, 2013, at 1:27 p.m. to the same number, Defendant Sullivan was addressed as Crank Deuce, and the following conversation occurred:

Defendant Sullivan: . . . . You know what you were talking about the last time when he called you, right?

Other: Ahhh.

Defendant Sullivan: Just stay up on that and see what Lil Buddy talking about on the LC. You feel me?

Other: I've been hitting him up and s*** you know what I'm saying? I've been hitting him up. I've been telling him I f[***] with. I have been telling him I f[***] with some more Groovers and s***

Defendant Sullivan: Yeah, that's what's up. . . .

Other: He wanted me to come over. I had to get my car fixed. He wanted me to come over and chill with him. So me and G are going to go over there and kick it with him and s*** and holler at that n[*****] about that s***

Defendant Sullivan: That's what's up. I see you. That's what's up because everything [is] lookin' goochy poochy. . . . We've got to make sure Lil Buddy don't come and don't do s*** like—he like—like word is. But then, you know Lil Buddy.

-13-

On February 20, 2013, at 7:29 p.m., Defendant Sullivan made another phone call to the same phone number, during which the following conversation transpired:

Defendant Sullivan: . . . . Hey, but you know that business that we—that cuz we've been hitting that groove on, right?

Other: Yeah, yeah, yeah.

Defendant Sullivan: Need to take care of, you know what I'm saying?

Other: Yeah, but you all hanging out. What you feelin'?

Defendant Sullivan: It's like, you know what I'm saying, it will be a no go if everything on that end don't show, you dig?

In a phone call on September 18, 2012, at 9:26 a.m., Defendant Sullivan identified himself as "Crank." During the conversation, he instructed the other participant, "It ain't Crank Deuce no more—it's Deuce Man. They call me Deuce Man." Defendant Sullivan also declared his intention to "back[] all the way out [of] the gang . . . completely," going so far as to say that he would no longer wear the gang's colors of orange and blue.

On February 23, 2013, at 4:22 p.m., Defendant Robinson made a phone call to Mr. Dyer's "big homey," who goes by the moniker "Bucc-it[4]," during which the following conversation transpired:

Defendant Robinson: Yeah. You know I go to court in April?

Other: I know, and I'm on top of that too.

Defendant Robinson: Yeah.

Other: I can't find that n[*]gga.

Defendant Robinson: Who?

_____

[4] This is the spelling used by Mr. Dyer. Detective Walker testified that members of the Crips do not spell any words using the letter combination of "ck" because those letters are an abbreviation for an offensive phrase—"Crip Killer"—used by their rivals, the Bloods.

| | |
|---|---|
| Other: | I can't find him. |
| Defendant Robinson: | Who?  Oh yeah, yeah, yeah. |
| Other: | Dude. |
| Defendant Robinson: | Yeah.  Ahh, he ain't coming. |
| Other: | Oh, all right. |
| Defendant Robinson: | Yeah, everything is good on that. . . . |

After the conclusion of the State's case-in-chief, none of the defendants presented any proof.  The jury convicted all of the defendants of attempted second degree murder, aggravated assault, and possession of a firearm during the commission of a dangerous felony.  The defendants were acquitted of employing a firearm during the commission of a dangerous felony.

During the second phase of the trial, the jury found that Defendants Bishop and Sullivan had prior drug-related felony convictions, which would enhance their sentences for the underlying offense of possession of a firearm during the commission of a dangerous felony.  Those enhancements are not challenged on appeal.

During the third phase of the trial, the jury found that the underlying offenses committed by Defendants Bonds, Bishop, and Sullivan were criminal gang offenses pursuant to Tennessee Code Annotated section 40-35-121 and subject to enhanced punishment.  For clarity, the relevant facts of this proceeding will be set forth below as each legal issue is analyzed.

At the sentencing hearing, the trial court enhanced Defendants Bonds, Bishop, and Sullivan to one classification higher for their convictions of attempted second degree murder and aggravated assault pursuant to subsection (b) of T.C.A. §40-35-121.  Defendant Bonds received an effective sentence of twenty-three years as a standard offender.  Defendant Bishop received an effective sentence of thirty-seven years as a multiple offender.  Defendant Sullivan received an effective sentence of forty years as a multiple offender.  Defendant Robinson received an effective sentence of eleven years as a standard offender.

After the trial court denied their respective motions for new trial, the defendants filed timely notices of appeal.

*II. Analysis*

On appeal, the defendants raise the following issues with regard to the guilt phase of the trial: (1) the trial court erred by allowing continued direct examination of the victim after the State announced that its examination of the witness was concluded; (2) the trial court erred by not suppressing the pre-trial identifications of the defendants made to Investigator Washam; (3) the trial court erred in admitting expert testimony from an emergency room nurse about the victim's injuries; (4) the trial court erred in admitting testimony from Detective Walker as a gang expert; (5) the trial court erred in admitting out-of-court statements made by each of the codefendants in their joint trial; and (6) the evidence is insufficient to support their convictions.

Defendants Bonds, Bishop, and Sullivan raise the following issues with regard to their criminal gang enhancements: (1) the trial court erred by failing to dismiss the charges due to defects in the presentment to the grand jury; (2) the statute violates the Confrontation Clause of the Sixth Amendment; (3) the statute violates the Due Process Clause of the Fourteenth Amendment; (4) the statute imposes cruel and unusual punishment in violation of the Eighth Amendment; (5) the trial court erred by admitting hearsay testimony from Detective Walker as a gang expert; (6) the trial court erred by denying the defendants an opportunity for closing argument; and (7) the evidence is insufficient to support their gang enhancements.

Individually, Defendant Bishop argues that the trial court erred in sentencing him as a multiple offender, and Defendant Sullivan argues that the trial court abused its discretion by imposing an excessive sentence.[5]

A. Guilt Phase

1. Continued Direct Examination of Victim

The defendants argue that the trial court erred in permitting the State to continue its direct examination of the victim after tendering the witness for cross-examination. The State concluded its direct examination of the victim at the end of the first day of the presentation of proof during the trial. The prosecutor announced that the State had no further questions for the witness and passed the witness to the defense. Cross-examination was to commence on the beginning of the second day of the trial. However,

---

[5] We have synthesized this list of issues based on the appellate briefs of all defendants.

the following morning, the State requested permission from the trial court to ask the victim additional questions. Over the defendants' objections, the trial court granted this request, and the State proceeded to elicit testimony from the victim about the presence of a firearm during the crime. The victim did not testify about a firearm during the first day.

A trial court's decision to permit the State to recall a witness is reviewed for an abuse of discretion. *See State v. McAlister*, 751 S.W.2d 436, 438 (Tenn. Crim. App. 1987). The defendants did not identify any prejudice from the trial court's decision aside from the inherent prejudice that exists in any incriminating testimony. There was no reason for the trial court to deny the State an opportunity to continue its direct examination. The defendants are not entitled to relief on this issue.

2. Pre-Trial Identification

The defendants argue that the trial court erred during the suppression hearing by permitting Investigator Washam to testify about the pre-trial identifications without testimony from the identifying witnesses. The defendants also argue that the trial court erred by not suppressing the identifications because they were conducted in an impermissibly suggestive manner and were unreliable.

At the suppression hearing, Investigator Washam's testimony was consistent with his subsequent trial testimony. Investigator Washam showed various six-photograph lineups to three different witnesses: Ms. Dibrell, Mr. Dyer, and Ms. White. On July 20, 2012, Investigator Washam showed Ms. Dibrell two lineups, and she identified Defendant Bishop and Defendant Bonds. On August 20, 2012, Investigator Washam presented Ms. Dibrell with a new lineup, and she identified Defendant Robinson. On the same day, Investigator Washam presented the lineups of Defendants Bonds, Robinson, and Bishop to Mr. Dyer. Mr. Dyer identified each of them, respectively. Investigator Washam also showed Mr. Dyer a lineup containing a photograph of Blake Kirk, who was a "running buddy" of Defendant Bonds, because Investigator Washam thought it possible that Mr. Kirk had also been involved in the crime. However, Mr. Dyer did not identify Mr. Kirk as one of his attackers. Similarly, Mr. Dyer also did not identify Antonio Williams, who was Defendant Bonds's cousin and a fellow gang member, as one of his attackers. On August 25, 2012, Investigator Washam showed Mr. Dyer a new lineup, which included a photograph of Defendant Sullivan. Mr. Dyer identified Defendant Sullivan. On October 22, 2012, Investigator Washam showed Ms. White the photo lineups of each defendant. Ms. White identified Defendants Robinson and Bishop, but she was unable to identify Defendants Bonds and Sullivan.

According to Investigator Washam, he usually prefaces showing a lineup to a witness by telling the witness:

> I'm going to show you a photo lineup of six people. The person may or may not be in there. Please don't pay attention to . . . facial hair or regular hair—that can change overnight—and just look at their features. If you recognize someone, I need you to tell me.

Investigator Washam denied giving instructions or making suggestions to any of the witnesses in this case about which photographs he wanted them to select.

To create the lineups in this case, Investigator Washam placed a driver's license of each defendant among five other driver's license photographs of individuals who possessed similar physical features and characteristics of the defendant, such as gender, hair style, facial hair style, and skin color. The photographs in the lineup of Defendant Bishop shown to Ms. Dibrell and Mr. Dyer were in black and white, rather than color, because that made the skin color of all six individuals more similar.[6] In the lineup of Defendant Bonds, Investigator Washam utilized colored photos because black and white "faded out several of the pictures." Investigator Washam ensured that, even in color, the skin complexion of every individual was "very similar." After completing the lineups of Defendants Bishop and Bonds, Investigator Washam asked another investigator, who was not involved with this case, to confirm that neither of the lineups suggested a particular photograph. The lineup of Defendant Robinson was also in black and white to ensure that her relatively lighter skin complexion did not stand out. Most but not all of the women in the lineup of Defendant Robinson were wearing earrings like she was in her photograph.

The trial court admitted into evidence all of the lineups that were presented to each witness, whether an identification was made or not, as well as a recording of the August 20th identifications made by Ms. Dibrell and Mr. Dyer.[7] Investigator Washam was the only witness who testified. After hearing the proof and the arguments of counsel, the trial court denied the motion to suppress.

The defendants argue that the trial court erred by admitting into evidence the pre-trial identifications of the defendants. First, they contend that the trial court erred in

---

[6] However, the lineup of Defendant Bishop shown to Ms. White was in color, rather than in black and white. This discrepancy was not addressed during the suppression hearing.

[7] Investigator Washam did not make recordings of all of the interviews.

permitting the State to introduce the identifications of Mr. Dyer, Ms. Dibrell, and Ms. White through the testimony of Investigator Washam at the suppression hearing because his testimony was based on hearsay and the identifying witnesses were not available for cross-examination. However, the Tennessee Rules of Evidence generally do not apply in hearings to determine the admissibility of evidence. Tenn. R. Evid. 104(a). Accordingly, Investigator Washam's hearsay testimony as to the identifications made by Mr. Dyer, Ms. Dibrell, and Ms. White was permissible at the suppression hearing. This same testimony by Investigator Washam was also permissible at trial because an exception to the hearsay rule exists for "[a] statement of identification of a person made after perceiving the person if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement." Tenn. R. Evid. 803(1.1). "[W]itnesses other than the declarant may testify about the identifying declaration" so long as the declarant will be available for cross-examination at the suppression hearing or at trial. Tenn. R. Evid. 808(1.1), Advisory Comm'n Comments. All of the witnesses who made the identifications testified at trial. Therefore, because the rules of evidence did not apply at the suppression hearing and because a hearsay exception applied at trial, no hearsay violation occurred at either proceeding.

The Supreme Court of the United States has held that "the Confrontation Clause precludes the admission of '[t]estimonial statements of witnesses absent from trial.'" *State v. Dotson*, 450 S.W.3d 1, 63 (Tenn. 2014) (quoting *Crawford v. Washington*, 541 U.S. 36, 59 (2004)). However, this Court has previously stated that "[t]he right to confrontation is a trial right and does not apply in suppression hearings." *Norris E. Ray v. State*, No. W2010-01675-CCA-R3-PC, 2011 WL 5996037, at *16 (citing *State v. Bush*, 942 S.W.2d 489, 511 (Tenn. 1997)) (referring to suppression hearing on a photographic array used in pre-trial identification), *perm app. denied* (Tenn. Apr. 12, 2012). Therefore, the defendants were not constitutionally entitled to confront the witnesses about their identifications at the suppression hearing. Furthermore, because those witnesses were available for cross-examination at trial, neither their trial testimony nor that of Investigator Washam violated the Confrontation Clause.

The defendants also argue that the identification procedures used by Investigator Washam were improper. To avoid exclusion from trial, "an identification must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification." *State v. Cribbs*, 967 S.W.2d 773, 794 (Tenn. 1998) (citing *Simmons v. United States*, 390 U.S. 377 (1968)). Nonetheless, an identification that is conducted in an impermissibly suggestive manner will not be excluded if the witness's identification was otherwise reliable under the circumstances. *State v. Philpott*, 882 S.W.2d 394, 400 (Tenn. Crim. App. 1994). Courts use a multi-factor inquiry to determine reliability, which includes "the opportunity of the witness to

view the criminal at the time of the crime; the witness's degree of attention at the time of the crime; the accuracy of the witness's prior description; the level of certainty demonstrated at the confrontation; [and] the time elapsed between the crime and the confrontation." *Id.* (citing *Neil v. Biggers*, 409 U.S. 188, 199 (1972)) (internal numbering omitted).

The trial court found that the identifications made by Mr. Dyer, Ms. Dibrell, and Ms. White were not conducted in an impermissibly suggestive manner. The record supports the findings of the trial court. Investigator Washam testified that he composed each of the six-photograph lineups by inserting the driver's license photograph of each defendant among five other driver's license photographs of individuals with similar appearances to that of the defendant. These similarities include gender, hair style, facial hair style, skin complexion, and jewelry. When the skin complexion of the individuals was too different, Investigator Washam used black and white images to eliminate the disparity. In this case, he had another detective evaluate several of the lineups for suggestiveness.

Upon our review of the lineups, we agree with the trial court that none of them are inherently or impermissibly suggestive. We also acknowledge the defendants' argument that Investigator Washam could have chosen to use what is known as the "double blind" method of conducting the lineup identifications, wherein neither the interviewer nor the interviewee knows which photograph within the lineup is that of the suspect. However, defendants have not identified any legal authority, and we are aware of none, requiring law enforcement officers to use any particular identification procedure, even if there exists a method or procedure which offers greater protection against the risk of misidentification than the one chosen by the investigating officer. The law simply prohibits use of any means of obtaining an identification that is unfairly suggestible. Investigator Washam denied suggesting to any of the witnesses in this case which photographs they should select. In fact, with respect to two suspects thought by Detective Washam to be involved, Mr. Dyer did not make identifications. Similarly, Ms. Dibrell and Ms. White were unable to identify all four of the defendants. The fact that each of the three witnesses did not make identifications in every lineup bolsters Detective Washam's testimony that he was not personally making suggestions to the witnesses and that the lineups themselves were not composed in such a manner as to suggest which photograph was the suspect.

Lastly, the defendants contend that the trial court did not and could not have properly applied the *Biggers* factors without testimony from the witnesses. However, the trial court was not required to conduct a *Biggers* analysis. The *Biggers* test for reliability is only triggered if the identification procedures were conducted in an impermissibly

suggestive manner. *State v. Michael Love*, No. W2012-00404-CCA-MR3-CD, 2013 WL 1042852, at *12 (Tenn. Crim. App. Mar. 13, 2013) (citing *State v. Butler*, 795 S.W.2d 680, 686 (Tenn. Crim. App. 1990)), *perm. app. denied* (Tenn. Apr. 1, 2014). Unlike some identification procedures, such as "one-on-one station house showups," *State v. Thomas*, 780 S.W.2d 379, 381 (Tenn. Crim. App. 1989), use of a six-photograph lineup, is not considered to be inherently suggestive, although such a lineup can be impermissibly suggestive where the photographs included within it are "grossly dissimilar." *See Michael Love*, 2013 WL 1042852, at *12 (citing *State v. Edwards*, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993)). Because neither the six-photograph lineups utilized in this case nor the circumstances under which they were presented to the witnesses were impermissibly suggestive, the trial court was not required to determine whether the identifications were nonetheless reliable under the circumstances. The defendants are not entitled to relief on this basis.

3. Nursing Expert

The defendants argue that the trial court erred in allowing an emergency room nurse to testify about the nature of Mr. Dyer's injuries because this subject exceeded the scope of her expertise—emergency nursing care.

Rebecca Greene was a registered nurse working in the emergency room at University of Tennessee Medical Center on May 30, 2012. She testified that when Mr. Dyer arrived in the emergency room, he was nonresponsive. He was classified as a full trauma alert, requiring immediate intervention, and he received the lowest possible score on the Glasgow Coma Scale based on the extent of his nonresponsiveness.

Mr. Dyer was not breathing well, so he was intubated with an endotracheal tube and a ventilator to supply oxygen to his body and to avoid "brain death." There was an abrasion with bruising and swelling on the right side of his head. There was an abrasion on the back side of his left shoulder and some swelling on the left side of his jaw. Nurse Greene testified that bruising results from blunt force trauma.

Mr. Dyer was placed in the intensive care unit ("ICU") and diagnosed with an intraparenchymal hemorrhage, which is "a bleed inside the tissues of the brain," and also diagnosed with a subdural hematoma, which is "a bleed outside of the brain," between the brain and the skull. Nurse Greene testified that both of these injuries are usually caused by blunt force trauma. Nurse Greene said that the head injury "could be" caused by "a carpet burn or something like that" or "could . . . have also been caused by being beaten with a weapon." She also said that the injuries could have been caused by blows from fists.

Over objections by all defendants, Nurse Greene testified that it was her opinion that Mr. Dyer's injuries were life-threatening because Mr. Dyer's body was unable to breathe effectively enough to sustain oxygen flow to the brain. She also testified that the bleeding in Mr. Dyer's brain could have caused brain damage from the accompanying swelling.

Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court. *See McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263-64 (Tenn. 1997); *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). On appellate review, the trial court's ruling shall not be overturned absent a finding that the trial court abused its discretion in admitting or excluding the expert testimony. *Ballard*, 855 S.W.2d at 562. "[A]n appellate court should find an abuse of discretion when it appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997).

Rule 702 of the Tennessee Rules of Evidence addresses the admissibility of opinion testimony of expert witnesses. It states in pertinent part:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Additionally, Tennessee Rule of Evidence 703 requires the expert's opinion to be supported by trustworthy facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." The determining factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002). Evidence constitutes "'scientific, technical, or other specialized knowledge,' if it concerns a matter that 'the average juror would not know, as a matter of course.'" *State v. Murphy*, 953 S.W.2d 200, 203 (Tenn. 1997) (quoting *State v. Bolin*, 922 S.W.2d 870, 874 (Tenn. 1996)). Additionally, an expert witness's testimony must be relevant to the issues at trial. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401.

In *McDaniel*, the supreme court adopted a non-exclusive list of factors that a trial court should consider when determining the reliability of expert testimony. 955 S.W.2d

at 265. Those include: (1) whether the scientific evidence has been tested and the accompanying methodology with which it was tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether the potential rate of error is known; (4) whether the evidence is generally accepted in the scientific community; and (5) whether the expert conducted the research in the field independent of litigation. *Id.* The application of the factors, a "gatekeeping function" of the trial court, operates to ensure introduction of testimony that "'characterizes the practice of an expert in the relevant field.'" *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 273 (Tenn. 2005) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1998)). However, the *McDaniel* factors are only relevant to the extent they are reasonable measures of testing the reliability of the proposed expert testimony. *Id.* at 277.

Nurse Greene was a registered nurse with an associate's degree in nursing. She had three years of nursing experience, all of those in an emergency room. Once tendered by the State, none of the defendants objected to her expertise, and the trial court deemed her to be an expert in the field of nursing care. As state above, Nurse Greene testified about Mr. Dyer's injuries, their possible causes, and the medical procedures that were used to treat those injuries. When asked if these injuries could have "caused his death" had he not received medical care, the defendants objected and argued that Nurse Greene was not competent to testify on this matter. The trial court overruled the objection, finding that "she does have specialized experience and training that enable her to render opinion testimony regarding the seriousness of injuries . . . ." The trial court questioned "how much experience has she had determining or connecting seriousness of injury to death," and Nurse Greene confirmed that she has had "occasion to see a number of people injured" and "occasion to see people die" in the emergency room. Nurse Greene then testified that Mr. Dyer's injuries were "life-threatening" because his lack of responsiveness was causing "inability to breathe appropriately to sustain oxygen to the brain."

To support the argument that Nurse Greene testified beyond her expertise, Defendant Bonds cites Tennessee Code Annotated section 63-7-103(b) which provides:

> Notwithstanding the provisions of subsection (a), the practice of professional nursing does not include acts of medical diagnosis or the development of a medical plan of care and therapeutics for a patient, except to the extent such acts may be authorized by §§ 63-1-132, 63-7-123 and 63-7-207.

However, subsection (a) of that statute provides in relevant part:

(a)(1) "Practice of professional nursing" means the performance for compensation of any act requiring substantial specialized judgment and skill based on knowledge of the natural, behavioral and nursing sciences and the humanities as the basis for application of the nursing process in wellness and illness care; and

(2) "Professional nursing" includes:

(A) Responsible supervision of a patient requiring skill and observation of symptoms and reactions and accurate recording of the facts;

(B) Promotion, restoration and maintenance of health or prevention of illness of others;

(C) Counseling, managing, supervising and teaching of others;

(D) Administration of medications and treatments as prescribed by a licensed physician, dentist, podiatrist, or nurse authorized to prescribe pursuant to § 63-7-123, or selected, ordered, or administered by an advanced practice nurse specializing as a certified registered nurse anesthetist (CRNA) . . . . ;

(E) Application of such nursing procedures as involve understanding of cause and effect; and

(F) Nursing management of illness, injury or infirmity including identification of patient problems.

Therefore, under the statutory definition of the scope of the practice of professional nursing, it seems that while Nurse Greene would not be permitted to render a medical diagnosis or to develop a medical plan of care, she was qualified to render an expert opinion as to "cause and effect" and "nursing management of illness, injury or infirmity including identification of patient problems." We find her testimony about the "life-threatening" nature of Mr. Dyer's injuries to be squarely within her field of expertise.

Defendant Bishop cites *State v. Jerome Johnson*, No. W2012-01754-CCA-R3-CD, 2013 WL 5488522 (Tenn. Crim. App. Sept. 30, 2013), *perm. app. denied* (Tenn. Feb. 11, 2014). In that case, the defendant challenged the sufficiency of the evidence for his conviction of aggravated assault. *Id.* at *5. This Court observed that there was "no expert medical testimony . . . presented at trial to assist in determining whether the

victim's injuries involved a substantial risk of death," despite testimony from the treating nurse that "the victim's collapsed lung, rib injuries, and asthma had 'the potential to be life-threatening." However, the court also explained that the nurse "was never qualified as an expert at trial." Contrary to Defendant Bishop's assertion, we do not read *Jerome Johnson* as providing any support for the proposition that a nurse cannot be competent to offer expert testimony on the life-threatening nature of injuries. In that case, the court merely acknowledged that such testimony could not be considered evidence of substantial risk of death where the trial court was not asked to perform its gatekeeping function by evaluating whether the nurse was qualified to offer expert testimony. That was not the case here.

We have no problem resting with the uncontroverted fact that Mr. Dyer's injuries, requiring a nine-week medically-induced coma, constitute serious bodily injury. The defendants are not entitled to relief on this basis.

4. Gang Expert

The defendants argue that the trial court erred in allowing Detective Walker to provide expert testimony in the field of gang identification because his entire testimony was irrelevant, cumulative, and unduly prejudicial. The State argues that his testimony was relevant and that the trial court did not abuse its discretion in admitting the evidence.

Relevant evidence is that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence must be relevant to be admissible. Tenn. R. Evid. 402. Where the probative value of relevant evidence is substantially outweighed by the danger of unfair prejudice, waste of time, or needless presentation of cumulative evidence, it may be inadmissible. Tenn. R. Evid. 403. A trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008). A trial court has abused its discretion if it "applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." *Id.* (citation omitted).

Detective Walker testified that he had six years of experience in the gang unit of the Knox County Sheriff's Office. "Since 1999, [he has] received over five hundred and twenty-nine hours of gang instruction to investigate gang crimes, identify different gang members and different gangs." As a state instructor, he has taught about 344 classes since 2006. On numerous occasions, he testified as a gang expert in both state and federal courts. He has an associate's degree in criminal justice from Roane State and a

bachelor's degree from Columbia Southern in criminal justice administration. He wrote and developed ten courses that were "post-certified" by the State of Tennessee to be taught to police officers and for official training credit. The trial court accepted Detective Walker as an expert in gang information and identification over the objection of the defendants.

The record demonstrates the relevance of Detective Walker's testimony. Much of his testimony was offered for identification purposes to connect the defendants' legal names with their gang monikers and for confirmation of their affiliation in the gang, which was something that the witnesses were largely unable to accomplish. The background about the gang's history and culture provided by Detective Walker was not merely gratuitous but was used to explain symbols or abbreviations relevant to identifying the defendants. Most importantly, however, his testimony about gang hierarchy and their customs with regard to initiation and expulsion, which occurs through violence generally in the form of beatings, was particularly relevant on the issues of intent and motive. Mr. Dyer's testimony about how the gang handled their affairs was piecemeal and confusing at times. Detective Walker's testimony clarified much of Mr. Dyer's testimony.

Although this evidence was undoubtedly prejudicial to the defendants, any unfair prejudice would have been minor. Detective Walker's testimony was largely didactic and not inflammatory in nature. It did not involve extraneous evidence of violence or bad acts by the defendants or the gang in general. It was not presented in such a manner as to emphasize the unsavory characteristics of criminal street gangs that contribute to common social stigma. Moreover, as the victim himself was also a gang member, this was not a situation where the jury would have been tempted to place undue emphasis on the defendants' gang affiliation for conduct against a nonmember. After a thorough review of the record on this issue, we cannot say that the trial court abused its discretion by admitting this evidence. The defendants are not entitled to relief on this issue.

5. Statements of Codefendants

The defendants argue that the trial court violated their constitutional rights by admitting incriminating statements in violation of *Bruton v. United States*, 391 U.S. 123 (1968), which prohibits the use of incriminating statements made by a non-testifying co-defendant against another defendant. The State argues that the defendants have waived

this issue, and we agree. Defendant Bonds's appellate brief[8] fails to specifically identify which evidence he deems improper, making only a general complaint about "numerous written and audio recorded statements of co-defendants." "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. R. Ct. Crim. App. 10(b); *State v. Thomas*, 158 S.W.3d 361, 393 (Tenn. 2005). We refuse to speculate about which pieces of evidence the defendants may find objectionable. The defendants are not entitled to relief on this basis.

6. Sufficiency of Evidence – The Guilt Phase

The defendants argue that the evidence is insufficient to support their convictions for attempted second degree murder, aggravated assault, and possession of a firearm during the commission of a dangerous felony.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Reid*, 91 S.W.3d at 277. Questions concerning the "credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). This standard of review applies whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two.

---

[8] Defendant Bonds was the only defendant to brief this issue. The other defendants simply adopted his argument.

*State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Second degree murder is the "knowing killing of another." T.C.A. § 39-13-210(a)(1). Relevant to this case, one who "[a]cts with intent to cause" the knowing killing of another and "believes the conduct will cause" the killing of another "without further conduct on the person's part" has attempted to commit second degree murder. *See* T.C.A. § 39-12-101(a)(2). Also relevant to this case, aggravated assault is intentionally or knowingly causing serious bodily injury to another. T.C.A. § 39-13-102(a)(1)(A)(i). Lastly, "[i]t is an offense to possess a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony." T.C.A. § 39-17-1324(a). Attempted second degree murder is a dangerous felony. T.C.A. § 39-17-1324(i)(1)(B).

The evidence presented in this case establishes that the victim and all of the defendants were members of the street gang known as the Five Deuce Hoover Crips. On May 30, 2012, the defendants showed up at the victim's apartment where he lived with his girlfriend. Once the victim opened the door, the defendants immediately entered the apartment and an argument ensued during which the victim was accused of shirking two obligations incumbent upon him as a fellow gang member. After a relatively brief exchange of shouting between the victim and several of the defendants, all of the defendants surrounded and attacked the victim, hitting him with their fists and kicking him with their feet.

The beating rendered the victim unconscious, and he remained in a medically-induced coma for approximately nine weeks. The victim sustained significant internal cranial bleeding, and without medical assistance, the victim could have died because his body was unable to breathe on its own. Fortunately, the victim was stabilized at the hospital, but when he regained consciousness, he was aggressive and did not recognize the people around him. The victim needed physical therapy to regain control of his excretory functions and to relearn how to walk and talk. The victim still has some memory trouble.

The defendants argue that the evidence does not support an inference that they intended to kill the victim rather than simply injure him. We disagree. "Intent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence." *State v. Inlow*, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000) (citing *State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)). Based on the severity of the victim's life-threatening physical injuries, a rational jury could have

inferred that the defendants intended to beat the victim to death as punishment for failing to meet his gang-imposed responsibilities. This conclusion is further supported by the expert testimony of Detective Walker, who explained that a gang-motivated "beat out" of an expelled gang member can be intended to cause either permanent physical impairment or death, both of which promote the gang's status within the community by increasing their threat level and instilling fear. "Whether the appellant[s] 'knowingly' attempted to kill [the] victim is a question of fact for the jury," *id.* at 104-05, and we will not disturb that finding, even if we would have decided otherwise.

Defendant Bishop argues that there is no proof that he "actually caused any injuries" to the victim or possessed a firearm. Defendant Robinson also argues that there is no evidence that she possessed a firearm. However, the victim specifically testified that he witnessed all of the defendants hit him, including Defendant Bishop. Nonetheless, the evidence is sufficient to hold all of the defendants criminally responsible for all crimes that occurred, which was correctly included in the trial court's jury charge. Under Tennessee Code Annotated section 39-11-402, a defendant is criminally responsible for an offense committed by the conduct of another person if, "with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the [defendant] solicits, directs, aids, or attempts to aid another person to commit the offense." Clearly, the defendants went to the victim's home with the shared purpose of confronting, intimidating, and beating him. As for possession of the firearm, the victim testified that Defendant Sullivan possessed a handgun in his pocket during the encounter, the handle of which was hanging out for all to see. The jury could have inferred that all of the other defendants, including Defendants Bishop and Robinson, were aware that Defendant Sullivan possessed the handgun and intended to benefit from his possession of the weapon with the possibility that it might be needed. *See State v. William Patrick Peebles*, No. M2011-01312-CCA-R3-CD, 2013 WL 2459881, at *6 (Tenn. Crim. App. June 6, 2013) (rejecting sufficiency of the evidence argument based on claim that the appellant "did not personally possess a firearm" where the appellant was criminally responsible for co-defendant's use of a firearm), *perm. app. denied* (Tenn. Nov. 13, 2013).

Defendant Bishop also argues that the presentment "failed to allege a statutory crime" because it did not include allegations of simple assault or include the allegation that the assault "involved the use or display of a deadly weapon." This argument is misguided. The language of the presentment contains all of the statutory elements of the offense of aggravated assault. Moreover, the State did not rely on the use of a deadly weapon to make the assault aggravated, rather it relied on the serious bodily injury sustained by the victim.

Defendant Sullivan argues that there is insufficient evidence that he was one of the attackers. We disagree. Although the victim acknowledged that an individual in one of Investigator Washam's lineups looked like the man he knew as Crank Deuce, the victim did not make an incorrect identification. Instead, he asked Investigator Washam for additional photographs, and on the next occasion, the victim confidently identified Defendant Sullivan as Crank Deuce and as one of his attackers. The victim was quite certain that Defendant Sullivan was part of the group because the victim noticed that Defendant Sullivan possessed a handgun. Although neither of the other witnesses identified Defendant Sullivan, "the testimony of a victim, by itself, is sufficient to support a conviction." *Id.* (citing *State v. Williams*, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981)). Additionally, we note that during the phone calls made by Defendant Sullivan on January 23 and February 20, he displayed consciousness of guilt about the crime when he encouraged efforts to discourage the victim from appearing in court.

Defendant Bonds argues that trial court should have merged the convictions for attempted second degree murder and aggravated assault and that, because it did not, those convictions violate the principles of Double Jeopardy. However, this Court has previously determined that dual convictions for these offenses do not violate the Double Jeopardy Clause. *State v. Dannaer Beard*, No. W2013-00502-CCA-MR3-CD, 2014 WL 5465860, at *4 (Tenn. Crim. App. Oct. 28, 2014), *perm. app. denied* (Tenn. Mar. 12, 2015). The defendants are not entitled to relief on this basis.

Because the evidence was sufficient to sustain each of the defendants' convictions, and there was no error in the guilt phase of the trial on the underlying offenses, those convictions are affirmed.

## B. Gang Enhancement Phase

Defendants Bonds, Bishop, and Sullivan raise several issues regarding their convictions under Tennessee Code Annotated section 40-35-121(b), which provides:

> A criminal gang offense committed by a defendant who was a criminal gang member at the time of the offense shall be punished one (1) classification higher than the classification established by the specific statute creating the offense committed.

As applicable to this case, the statute defines "criminal gang offense" as:

> (A) A criminal offense committed prior to July 1, 2013 that:

(i) During the perpetration of which the defendant knowingly causes, or threatens to cause, death or bodily injury to another person or persons . . . ; or

(ii) Results, or was intended to result, in the defendant's receiving income, benefit, property, money or anything of value from the commission of any aggravated burglary, or from the illegal sale, delivery, or manufacture of a controlled substance, controlled substance analogue, or firearm[.]

T.C.A. § 40-35-121(a)(3)(A). The statute defines a "criminal gang member" as "a person who is a member of a criminal gang," as established by satisfaction of two or more of the following criteria:

(A) Admits to criminal gang involvement;

(B) Is identified as a criminal gang member by a parent or guardian;

(C) Is identified as a criminal gang member by a documented reliable informant;

(D) Resides in or frequents a particular criminal gang's area, adopts their style or dress, their use of hand signs or their tattoos and associates with known criminal gang members;

(E) Is identified as a criminal gang member by an informant of previously untested reliability and the identification is corroborated by independent information;

(F) Has been arrested more than once in the company of identified criminal gang members for offenses that are consistent with usual criminal gang activity; or

(G) Is identified as a criminal gang member by physical evidence such as photographs or other documentation[.]

T.C.A. § 40-35-121(a)(2). The statute defines a "criminal gang" as "a formal or informal ongoing organization, association or group consisting of three (3) or more persons that has . . . [a]s one (1) of its activities the commission of criminal acts; and [t]wo (2) or more members who, individually or collectively, engage in or have engaged in a pattern of criminal gang activity[.]" T.C.A. § 40-35-121(a)(1)(A)-(B). The statute defines

"pattern of criminal gang activity" as "prior convictions for the commission or attempted commission of" the following:

(i) Two (2) or more criminal gang offenses that are classified as felonies; or

(ii) Three (3) or more criminal gang offenses that are classified as misdemeanors; or

(iii) One (1) or more criminal gang offenses that are classified as felonies and two (2) or more criminal gang offenses that are classified as misdemeanors; and

(iv) The criminal gang offenses are committed on separate occasions; and

(v) The criminal gang offenses are committed within a five-year period[.]

T.C.A. § 40-35-121(a)(4)(A). The statute utilizes the same definition for the underlying criminal gang offense and the predicate offenses required to establish a pattern of criminal gang activity. *See* T.C.A. § 40-35-121(i).

To prove that the Five Deuce Hoover Crips satisfied the statutory definition of a criminal gang, the State presented proof regarding the criminal histories of seven individuals. First, Joy McCroskey, the Knox County Criminal Court Clerk, testified and provided certified copies of convictions for those individuals. All of the convictions were felonies committed between September 8, 2005, and January 25, 2011. The convictions were entered between July 11, 2006, and May 2, 2011.

Then, Detective Walker testified that each one of those individuals (and several others) was or had been a member of the Five Deuce Hoover Crips. Some of Detective Walker's responses suggested that he had no personal knowledge of the facts of the underlying cases for any of those individuals. His testimony was based on a gang file compiled and maintained by the Knox County Sheriff's Office. The information in the files on each gang member is obtained through personal interviews with arrestees, mail searches and prison records of inmates, cell phone searches, and information from informants. According to Detective Walker, all information is "verif[ied] to make sure that it is true and accurate." Detective Walker testified about the information in the gang file upon which the Sheriff's Office relied in determining that each of the seven individuals were members of the Five Deuce Hoover Crips. Additionally, Detective Walker testified that Defendants Bonds, Bishop, and Sullivan were also members of the Five Deuce Hoover Crips.

Detective Walker also testified about the origin of the Five Deuce Hoover Crips as a violent criminal gang and explained that their activities include "drug dealing mostly, robberies, agg[ravated] assaults, attempted murder, stuff like that." The contents of the gang file relied upon by Detective Walker were admitted into evidence.

1. Defective Presentment

Defendants Bonds, Bishop, and Sullivan argue that the trial court erred in refusing to dismiss this case because the criminal enhancement charges were not included in the presentment to the grand jury. Counsel for Defendant Bonds told the trial court that he had only received counts one through eight at the arraignment and did not learn of the gang enhancement charges until shortly before the hearing date.

Tennessee Code Annotated section 40-35-121(g) provides:

If the defendant is charged with a criminal gang offense and the district attorney general intends to seek enhancement of the punishment under subsection (b), (c) or (e), the indictment, in a separate count, shall specify, charge and give notice of the subsection under which enhancement is alleged applicable and of the required prior convictions constituting the gang's pattern of criminal gang activity.

Questions of law presented by a trial court's ruling on a motion to dismiss an allegedly defective indictment or presentment are reviewed de novo with no presumption of correctness. *See State v. Sherman*, 266 S.W.3d 395, 403 (Tenn. 2008).

In this case, the defendants were charged collectively by presentment. The true bill is dated August 28, 2012, and was signed by the grand jury foreperson and all of the grand jury members. The second through fifth pages of the presentment contain eight counts, constituting the underlying offenses in this case. The fifth page contains a signature block that was signed by the district attorney. The following page is topped with the case caption. The case numbers are handwritten on the upper right corner. A list of witnesses and their addresses are set forth below. The seventh page is titled "Criminal Gang Offense Enhancement." The seventh through eleventh pages contain counts nine through eleven, which are the gang enhancement charges against Defendants Bonds, Bishop, and Sullivan. The eleventh page contains a signature block that was signed by the district attorney.

At the pre-trial hearing on the motion to dismiss the presentment, the prosecutor informed the trial court that the entire presentment, pages one through eleven, was presented to the grand jury at one time. The true bill signed by the grand jury encompassed all counts, including the gang enhancement offenses. According to the prosecutor, the reason that the gang enhancement offenses were titled separately and contained on additional pages was for physical severability of the pages in the presentment. Expecting that the presentment would be made available to the jury during their deliberations on the guilt phase of the trial and that the jury would not be aware of the gang enhancement offenses during that phase of the proceeding, the State structured the presentment in such a way that the pages containing the gang enhancement offenses could be easily separated. The prosecutor explained that, at the time of the presentment, the district attorney's office did not have a pre-constructed "macro" for the gang enhancement offenses in its word processing software, so those counts had to be created from scratch, which was why the format of those charges was different than the charges for the underlying offenses.

Relying on the contents of the case file and the representations of the prosecutor, the trial court denied the motion. We find no error in the trial court's ruling. "Unless a defect in an indictment appears on the face of the indictment, the initial burden of proof is on the defendant to establish the grounds of the motion to dismiss." W. Mark Ward, Tennessee Criminal Trial Practice § 14:5 (2014-2015 ed.) (citing *Shadden v. State*, 488 S.W.2d 54, 60 (Tenn. Crim. App. 1972), *overruled on other grounds by State v. Jones*, 598 S.W.2d 209 (Tenn. 1980)). Here, there was absolutely no evidence to support the defendants' claim that the gang enhancement offenses were not included in the presentment before the grand jury.

At the hearing, the trial court did not make a specific ruling on Defendant Bonds's claim that he was not given notice of the gang enhancement offenses at his arraignment, although it did note that an entire copy of the presentment was included in the court file. However, even if this claim were true, it would not entitle Defendant Bonds to relief. He eventually learned of the gang enhancement before trial and did not present any evidence of prejudice from the late notice. *See State v. Joshua Tyrell Cross*, No. E2014-00963-CCA-R3-CD, 2015 WL 477296, at *13 (Tenn. Crim. App. Feb. 4, 2015) (concluding that lack of formal arraignment did not warrant reversal where the trial court informed the defendant of the charges at the guilty plea hearing), *no perm. app. filed*. Defendant is not entitled to relief on this basis.

2. Confrontation Clause

The defendants argue that the testimony of Detective Walker during the enhancement phase violated the Confrontation Clause because it was based on testimonial hearsay. The State argues that the Confrontation Clause does not extend to sentencing proceedings. Defendant Sullivan concedes that the gang enhancement is a sentencing enhancement, but nonetheless argues that the Confrontation Clause's prohibition on testimonial hearsay should have been applied by the trial court.

As previously stated, "the Confrontation Clause precludes the admission of '[t]estimonial statements of witnesses absent from trial.'" *Dotson*, 450 S.W.3d at 63 (quoting *Crawford*, 541 U.S. at 59). This Court has repeatedly recognized that the Confrontation Clause is not applicable to sentencing hearings. *See, e.g.*, *State v. Thomas William Whited*, No. E2013-02523-CCA-R3-CD, 2015 WL 2097843, at *10 (Tenn. Crim. App. May 4, 2015), *perm. app. granted* (Tenn. Sept. 22, 2015); *State v. Arealie Boyd*, No. W2009-00762-CCA-R3-CD, 2010 WL 1240720, at *7-8 (Tenn. Crim. App. Mar. 30, 2010) (citing *State v. William Edwin Harris*, No. M2008-01685-CCA-R3-CD, 2009 WL 1871919, at *6 (Tenn. Crim. App. June 30, 2009), *perm. app. denied* (Tenn. Nov. 30, 2009)), *no perm. app. filed*; *see also State v. Stephenson*, 195 S.W.3d 574, 590 (Tenn. 2006) (observing that "the federal appellate courts continue to hold that the Sixth Amendment right of confrontation does not apply at sentencing, even after *Crawford*"), *abrogated on other grounds by State v. Watkins*, 195 S.W.3d 530 (Tenn. 2012).

For purposes of the Sixth Amendment's right to a jury trial, the Supreme Court has determined that, "[w]hen a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense and must be submitted to the jury." *Alleyne v. United States*, --- U.S. ---, 133 S.Ct. 2151, 2162 (2013). Thus, "'facts that increase the prescribed range of penalties to which a criminal defendant is exposed' are elements of the crime" which must be proven beyond a reasonable doubt to a jury, regardless of whether those facts increase the statutory maximum or mandatory minimum of the sentencing range. *Id.* at 2160 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Despite simply being dubbed by the General Assembly as "enhanced punishment," the factual requirements of Section 40-35-121 are elements of the underlying criminal gang offenses because the statute increases the prescribed range of penalties applicable to a defendant by automatically increasing the underlying offense's sentencing classification by at least one range, raising both the maximum and minimum ends of the range. *See People v. Sengpadychith*, 27 P.3d 739 (Cal. 2001) (holding that *Apprendi* applies to certain felonies subject to gang enhancement). We think it necessarily follows that the protections of the Confrontation Clause of the Sixth Amendment also apply to the presentation of any proof within the constitutional scope of

a jury trial. Accordingly, the "gang enhancement" portion of the proceeding in this case was an extension of the actual guilt phase of the trial on the underlying criminal offenses; it was not a merely a sentencing hearing.

In this case, Defendants Bonds, Bishop, and Sullivan raised numerous hearsay and Confrontation Clause objections to the testimony of the gang expert. The trial court noted the defendants' "standing objection" to the testimony of the gang expert and the introduction of the contents of the gang file on the various members of the Five Deuce Hoover Crips. At one point, during Defendant Bishop's cross-examination of the gang expert about his specific, personal knowledge of particular information in the gang file, the trial court sustained relevance objections from the State. After cross-examination was concluded, Defendant Sullivan moved for a judgment of acquittal. The State objected, arguing that they were merely involved in "sentencing hearing." The trial court agreed, noting, "This is an enhancement provision. It's not a separate freestanding crime." The trial court then proceeded with a jury-out hearing on Defendant Sullivan's motion, which was adopted by the other two defendants. After hearing arguments from counsel, the trial court made the following ruling, in part:

> This is rather unchartered territory. Your objections to the results of investigation that gave rise to the certification of your clients as gang members, certainly I can see a legitimate argument about the hearsay, but it would appear that what this legislation intends is for evidence of this sort to be compiled by the police and introduced in effect as a business record exception. They collect information and create a file. At this point, this court is going to accept the proposition that our law, especially the business record exception, is going to be . . . that that evidence is admissible in these cases.

Counsel for Defendant Sullivan posed the question of whether the gang enhancement statute was actually a "status offense," to which the trial court responded:

> No, this is an enhancing factor. It's not a separate offense. It doesn't have separate elements that have to be proved. There are necessary findings but this is not a separate freestanding crime. . . . This is simply circumstances permitting the enhancement of an offense and they have to be found true by a jury . . . before the Court can enhance the sentence based on these findings. It has to be submitted to a jury and that's what we're doing now.

Because this is a unique case of first impression, and there is no previous appellate court guidance on the substantive or procedural aspects of this statute, we have much

sympathy for the trial court and the attorneys involved in this proceeding. However, the trial court and the State miscomprehended the nature of the third phase of the trial. It was not a sentencing hearing. All constitutional and procedural criminal protections were applicable, including the Confrontation Clause and the Rules of Evidence.

Even assuming, without deciding, that the gang file was properly admitted through one of the hearsay exceptions,[9] such satisfaction alone does not mean that there was not a violation of the Confrontation Clause. *State v. McCoy*, 459 S.W.3d 1, 12 (Tenn. 2014). The trial court should have permitted the defendants to make specific objections to any of the material within the gang file or the expert testimony, rather than noting only a general standing objection to the evidence, and the trial court should have examined each potential piece of hearsay independently to determine whether it was testimonial or non-testimonial for purposes of the Confrontation Clause. The trial court also should have permitted the defendants to cross-examine the gang expert about the circumstances under which all of the evidence in the gang file was obtained and by whom the evidence was obtained, rather than relying only on the gang expert's general description of how the gang file was compiled and maintained by the Sheriff's Office. Conducting a Confrontation Clause analysis of whether a statement is testimonial hinges on factual information about the circumstances under which a hearsay statement was made. We find this record too incomplete to reach a conclusion on the resolution of the Confrontation Clause issue raised by the defendants. Once challenged, the State bears the burden of proving that its proffered evidence is constitutionally permissible. *See State v. Huddleston*, 924 S.W.2d 666, 675 (Tenn. 1996). It failed to carry this burden.

---

[9] As noted above, the trial court indicated that it was admitting the gang file under the business records hearsay exception. However, we note that the trial court did not explain how the gang file satisfied the requirements of Tennessee Rule of Evidence 803(6). We also note that the State and the trial court, at times, seemed to be under the impression that the gang file might be admissible in its entirety under Tennessee Rule of Evidence 703, although the trial court did not make a ruling to that effect. Because the Confrontation Clause implications of the admission of hearsay "basis evidence" from gang experts is currently before the Supreme Court of California, *see People v. Sanchez*, 167 Cal. Rptr.3d 9, 22-24 (Cal. Ct. App. 2014), *review granted*, 324 P.3d 273 (Cal. May 14, 2014), we encourage the trial court to carefully consider an argument on the admissibility of this evidence on this basis, in the event that this case is ultimately remanded for a new determination on the gang enhancement. We also express our concern that the nature of the gang expert's testimony may have been improper "parroting" of the hearsay contents of the gang file to the jury rather than true expert opinion independently formed on the basis of that information. *See, e.g.*, *United States v. Mejia*, 545 F.3d 179, 197-99 (2d Cir. 2008) (examining basis of gang expert testimony under Federal Rule of Evidence 703 and the Confrontation Clause).

To briefly summarize, we hold that the requirements of Section 40-35-121 are additional elements of the underlying criminal gang offenses and the portion of the trial during which proof of gang membership and activity is introduced is not merely a sentencing hearing but rather is an extension of the guilt phase of the trial to which constitutional, statutory, and procedural rules fully apply. Because the trial court treated the proceeding as a sentencing hearing, without considering the protection afforded by the Confrontation Clause, and because the State failed to prove by a preponderance of the evidence that the gang expert's testimony and the contents of the gang file did not violate the Confrontation Clause, we reverse the defendants' gang enhancement convictions and remand this case for a new trial on the gang enhancement.

3. Due Process

The defendants argue that Tennessee Code Annotated section 40-35-121 violates the principles of due process because it is both unconstitutionally vague and lacks language restricting its scope to underlying gang-related offenses. Generally, this Court will not address the constitutional validity of a statute when we can dispose of the case on other grounds. *See Waters v. Farr*, 291 S.W.3d 873, 882 (Tenn. 2009) ("It is well-settled in Tennessee that 'courts do not decide constitutional questions unless resolution is absolutely necessary to determining the issues in the case and adjudicating the rights of the parties.'" (quoting *State v. Taylor*, 70 S.W.3d 717, 720 (Tenn. 2002))). In this case, however, our conclusion that the case must be remanded for a new trial on the gang enhancements does not fully adjudicate the rights of the parties. If the defendants prevail on their facial constitutional challenges, they would not be subject to the gang enhancement at all—a very different disposition than a remand for retrial. For this reason, we will address the constitutional due process challenges to Section 40-35-121.

The defendants argue that Tennessee Code Annotated section 40-35-121(a)(3)(A)(i) is unconstitutionally vague on its face because it does not specify "what is and is not a gang[-]related offense." The State maintains that the statute is not vague because it clearly defines the conduct that is prohibited.

A "vague statute is vulnerable to a constitutional challenge because it (1) fails to provide fair notice that certain activities are unlawful; and (2) fails to establish reasonably clear guidelines for law enforcement officials and courts, which, in turn, invites arbitrary and discriminatory enforcement." *State v. Pickett*, 211 S.W.3d 696 702 (Tenn. 2007). In regards to the former, "[d]ue process requires that a statute provide 'fair warning' and prohibits holding an individual criminally liable for conduct that a person of common intelligence would not have understood to be proscribed." *State v. Burkhart*, 58 S.W.3d 694, 697 (Tenn. 2001) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).

To avoid constitutional infirmity, a criminal statute must be "sufficiently precise to put an individual on notice of prohibited activities." *Id.* (quoting *State v. Wilkins*, 655 S.W.2d 914, 915 (Tenn. 1983)).

As stated above, Section 40-35-121(b) provides that "[a] criminal gang offense committed by a defendant who was a criminal gang member at the time of the offense shall be punished one (1) classification higher than the classification established by the specific statute creating the offense committed." Pertinent to this case, the statute defines "criminal gang offense" as "[a] criminal offense committed prior to July 1, 2013 that . . . [d]uring the perpetration of which the defendant knowingly causes, or threatens to cause, death or bodily injury to another person or persons . . . ." T.C.A. § 40-35-121(a)(3)(A)(i).

Although Section 40-35-121 does not contain definitions of the terms "criminal offense" or "death" or "bodily injury," those terms are either defined elsewhere within the Code or capable of ready understanding. Tennessee Code Annotated section 39-11-102(a) provides that "[c]onduct does not constitute an offense unless it is defined as an offense by statute, municipal ordinance, or rule authorized by and lawfully adopted under a statute." Thus, we know that a "criminal offense" is an offense defined as such "by statute, municipal ordinance, or rule authorized by and lawfully adopted under a statute." *Id.* We further know that "the general principles" regarding offense definition "apply to offenses defined in all volumes of the Tennessee Code Annotated unless the law provides otherwise." T.C.A. § 39-11-102, Sentencing Comm'n Commts. "[A] person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist" or "with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-106(20). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" T.C.A. § 39-11-106(2). Although the term "death" is not defined in our criminal statutory scheme, that term is capable of ready understanding by a person of ordinary intelligence.

Accordingly, we conclude that the statute is sufficiently precise to provide fair warning of the conduct covered by the statute. Simply put, the statute applies when a criminal gang member injures or kills someone, or threatens to do so, while committing a crime. A person of common intelligence would have no trouble understanding this plain meaning. Because the defendants have not alleged vagueness in any other language in the statute, we have not considered whether any other aspect of the statute is vague.

The defendants also argue that Tennessee Code Annotated section 40-35-121(b) is unconstitutional as a violation of substantive due process. Specifically, they contend that the statute lacks a nexus between gang membership and criminal conduct. As explained in Defendant Sullivan's appellate brief:

> Enhancement applies regardless of a defendant's knowledge or control of, or consent to, the other alleged gang members' criminal acts. Conversely, enhancement does not require that the [S]tate show that the offenses committed by others w[ere] committed for the benefit of, at the direction of, or in association with any criminal street gang. The statute does not even require that crimes committed by the other alleged gang members be gang[-]related, just that the crimes be committed by alleged gang members. Assuming that a defendant is a gang member, the statute would punish a defendant not for his own acts, but because of unrelated criminal acts of persons with whom he may have been or is associated, or over whom he has no control whatsoever. This amounts to enhanced sentencing based on association, and nothing else.

The State did not address this issue in its appellate brief, but it addressed the issue at oral argument. After hearing oral argument, this Court ordered supplemental briefing on this specific issue in which the State argued that the criminal gang statute was constitutional as applied to the defendants in this case.

For support, the defendants rely on *State v. O.C.*, 748 So.2d 945 (Fla. 1999). In that case, a juvenile was convicted of aggravated battery for participating in the beating of another youth after exiting a school bus. After being convicted, the defendant was then found to be a member of a criminal street gang, which caused the underlying conviction to be enhanced by one felony classification. The relevant criminal gang statute provided:

> (2) "Criminal Street Gang Member" is a person who is a member of a criminal street gang . . . and who meets two or more of the following criteria:
>
> (a) Admits to criminal street gang membership.
>
> (b) Is identified as a criminal street gang member by a parent or guardian.
>
> (c) Is identified as a criminal street gang member by a documented reliable informant.

(d) Resides in or frequents a particular criminal street gang's area and adopts their style of dress, their use of hand signs, or their tattoos, and associates with known criminal street gang members.

(e) Is identified as a criminal street gang member by an informant of previously untested reliability and such identification is corroborated by independent information.

(f) Has been arrested more than once in the company of identified criminal street gang members for offenses which are consistent with usual criminal street gang activity.

(g) Is identified as a criminal street gang member by physical evidence such as photographs or other documentation.

(h) Has been stopped in the company of known criminal street gang members four or more times.

*Id.* at 947 n.1 (citing Fla. Stat. § 874.03(2)(a)-(h) (Supp. 1996)).  The statute defined a "criminal street gang" as:

A formal or informal ongoing organization, association, or group that has as one of its primary activities the commission of criminal or delinquent acts, and that consists of three or more persons who have a common name or common identifying signs, colors, or symbols and have two or more members who, individually or collectively, engage in or have engaged in a pattern of criminal street gang activity.

*Id.* at 948 (citing Fla. Stat. § 874.03(1)).  The statute defined a "pattern of criminal street gang activity" as:

The commission or attempted commission of, or solicitation or conspiracy to commit, two or more felony or three or more misdemeanor offenses, or one felony and two misdemeanor offenses, or the comparable number of delinquent acts or violations of law which would be felonies or misdemeanors if committed by an adult, in separate occasions within a 3-year period.

*Id.* at 948 n.2 (citing Fla. Stat. § 874.03(3)).

The Supreme Court of Florida held that the gang statute was "unconstitutional as a violation of substantive due process." *Id.* at 950. The court explained:

> [S]ection 874.07 punishes mere association by providing for an enhancement of the degree of a crime based on membership in a criminal gang, even where the membership had no connection with the crime for which the defendant had been found guilty. . . . [B]ecause the statute punishes gang membership without requiring any nexus between the criminal activity and gang membership, it lacks a rational relationship to the legislative goal of reducing gang violence or activity and thus fails to have a 'reasonable and substantial relation' to a permissible legislative objective.

*Id.*

The State asserts that *O.C.* is distinguishable from this case because the facts in this case clearly establish that the underlying crimes were gang-related—the victim was "beat out" of the gang for allegedly failing in his obligations to the gang.

The Fourteenth Amendment to the Constitution of the United States guarantees that no "State [shall] deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Law of the Land Clause in Article I, section 8 of the Tennessee Constitution "has consistently been interpreted as conferring identical due process protections as its federal counterparts." *Mansell v. Bridgestone Firestone North American Tire, LLC*, 417 S.W.3d 393, 407 (Tenn. 2013) (citing *Burford v. State*, 845 S.W.2d 204, 207 (Tenn. 1992)). Our supreme court has acknowledged that the concept of due process entails both procedural and substantive components. *Id.* (citing *Lynch v. City of Jellico*, 205 S.W.3d 384, 391 (Tenn. 2006)). "The most basic principle underpinning procedural due process is that individuals be given an opportunity to have their legal claims heard at a meaningful time and in a meaningful manner." *Id.* (quoting *Lynch*, 205 S.W.3d at 391). "In contrast to procedural due process, substantive due process bars oppressive government action regardless of the fairness of the procedures used to implement the action." *Id.* at 409 (citing *Lynch*, 205 S.W.3d at 391-92). "Unless a fundamental right is involved, the test for determining whether a statute comports with substantive due process is whether the legislation bears 'a reasonable relation to a proper legislative purpose' and is 'neither arbitrary nor discriminatory.'" *Newton v. Cox*, 878 S.W.2d 105, 110 (Tenn. 1994) (quoting *Nebbia v. New York*, 291 U.S. 502, 537 (1934)).

"Issues of constitutional interpretation are questions of law which we review de novo without any presumption of correctness given to the legal conclusions of the courts below." *Waters*, 291 S.W.3d at 882 (citing *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 836 (Tenn. 2008)). When reviewing the constitutionality of a statute, we begin "with the presumption that an act of the General Assembly is constitutional" and "must indulge every presumption and resolve every doubt in favor of constitutionality." *Riggs v. Burson*, 941 S.W.2d 44, 51 (Tenn. 1997). Our research reveals that this case is the first appellate decision construing our gang enhancement statute in any way. Given the lack of guidance, we proceed with caution.

The *O.C.* court struck down the statute before it for failing rational basis review. Our courts have previously applied this type of judicial scrutiny to state statutes under a substantive due process analysis, as have courts in other jurisdictions. *See generally* Wayne R. LaFave, 1 Subst. Crim. L. § 3.3 (2d ed.) (distinguishing this type of due process analysis from the due process analysis applied to laws allegedly burdening fundamental rights). Given the deference to legislative decision-making afforded by this level of scrutiny, most of those cases have concluded that the statute in question is reasonably related to a legitimate government purpose. *See, e.g.*, *Riggs v. Burson*, 941 S.W.2d 44, 52 (Tenn. 1997) (upholding helicopter-related land use restrictions near a national park); *State v. Smith*, 48 S.W.3d 159, 169-70 (Tenn. Crim. App. 2000) (upholding application of Drug Free School Zone Act to conduct occurring outside of normal school hours); *Martin v. Beer Board*, 908 S.W.2d 941, 955 (Tenn. Ct. App. 1995) (upholding local restrictions on the sale of alcohol on Sundays). However, on at least one occasion, our supreme court has found government action to fall short of this basic requirement. *See Doe v. Norris*, 751 S.W.2d 834, 840 (Tenn. 1988) (holding that "the commingling of status offenders with delinquent children in secure penal facilities operated for delinquent children was not rationally related to a legitimate government purpose" and therefore was a "practice [that] violate[d] the principles of substantive due process").

Our supreme court has recognized that "the Legislature has the authority to enact laws for the public safety, comfort and welfare." *Riggs*, 941 S.W.2d at 51. Because criminal laws fall squarely within this domain, *see State v. Wyrick*, 62 S.W.3d 751, 792 (Tenn. Crim. App. 2001) (citing *Motlow v. State*, 145 S.W. 177, 183 (1912)), we have no trouble concluding (and the defendants do not contest) that proscribing harmful street gang activity is a proper legislative purpose. The material inquiry in this case is whether Section 40-35-121(b) is reasonably related to that legislative purpose. Under a means-end review, "specific evidence is not necessary to show the relationship between the statute and its purposes." *Riggs*, 941 S.W.2d at 52 (citing *Newton*, 878 S.W.2d at 110). The court in *O.C.* held that the gang statute in that case was not reasonably related to a

legitimate legislative purpose because it lacked a nexus between the underlying criminal activity and gang affiliation. We note that the statute struck down in that case was strikingly similar to Section 40-35-121(b). Like the statute in *O.C.*, Section 40-35-121(b) does not contain a nexus requirement. After careful consideration, we have concluded that such an omission is constitutionally fatal. It simply cannot be maintained that a statute ostensibly intended to deter gang-related criminal conduct through enhanced sentencing is reasonably related to that purpose where the statute in question is completely devoid of language requiring that the underlying offense be somehow gang-related before the sentencing enhancement is applied. Without a nexus requirement, Section 40-35-121(b) directly advances only the objective of harsher treatment of criminal offenders who also happen to be members of a criminal gang. Because Section 40-35-121(b) fails to even obtusely target gang-related criminal activity, it lacks a reasonable relationship to achieving the legitimate legislative purpose of deterring criminal gang activity and therefore violates the principles of substantive due process.

Additionally, we also agree with the defendants' guilt by association argument based on *Scales v. United States*, 367 U.S. 203 (1961). In that case, the Supreme Court of the United States provided an insightful discussion of the limitations imposed on governmental police power by the constitutional protections of due process. The Court declared:

> In our jurisprudence guilt is personal, and when the imposition of punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct to other concededly criminal activity . . ., that relationship must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause . . . .

*Id.* at 224-25. Examining a federal law that criminalized knowing membership in "any organization which advocates the overthrow of the Government of the United States by force or violence," *id.* at 205, the Court concluded that the requirements of the Due Process Clause were satisfied "when the statute is found to reach only 'active' members having also a guilty knowledge and intent, and which therefore prevents a conviction on what otherwise might be regarded as merely an expression of sympathy with the alleged criminal enterprise, unaccompanied by any significant action in its support or any commitment to undertake such action," *id.* at 228. In reaching its decision, the Court observed:

It must indeed be recognized that a person who merely becomes a member of an illegal organization, by that 'act' alone need be doing nothing more than signifying his assent to its purposes and activities on one hand, and providing, on the other, only the sort of moral encouragement which comes from the knowledge that others believe in what the organization is doing. It may indeed be argued that such assent and encouragement do fall short of the concrete, practical impetus given to a criminal enterprise which is lent for instance by a commitment on the part of a conspirator to act in furtherance of that enterprise. A member, as distinguished from a conspirator, may indicate his approval of a criminal enterprise by the very fact of his membership without thereby necessarily committing himself to further it by any act or course of conduct whatever.

*Id.* at 227-28.

We believe that Section 40-35-121(b) runs afoul of the bounds of due process delineated in *Scales* because it imposes mandatory criminal punishment based on the criminal conduct of others. Without a nexus requirement that the underlying offense be gang-related, Section 40-35-121(b) is untethered to any personal criminal intent or conduct by the defendant. There is no Tennessee law prohibiting membership or affiliation with a criminal gang as defined in Section 40-35-121. Thus, a defendant's affiliation with such a group is statutorily permissible and innocuous until it is joined with otherwise criminal conduct. However, Section 40-35-121(b) imposes mandatory punishment on an eligible defendant by imputing to him responsibility for the criminal activity of the gang as a collective without requiring the defendant's knowledge of and intent to promote such activity. We simply cannot believe that the concept of personal guilt articulated in *Scales* tolerates such an attenuated basis for criminal punishment. Indeed, a literal reading of the statute reveals that the scope of its potential application is startling, also posing an increased risk of arbitrary application.[10]

_____

[10] As written on May 30, 2012, a defendant who happened to be a member of a college Greek organization with at least a three person membership, *see* T.C.A. § 40-35-121(a)(1), and he or she wears the organization's colors and letters or appears in club photos, *see* T.C.A. § 40-35-121(a)(2)(D)(G), could be subject to a gang enhanced sentence if convicted of a minor criminal offense, wholly unrelated to the organization. If the organization happens to engage in activities which are criminal acts, *see* T.C.A. § 40-35-121(a)(1)(A) (e.g., underage drinking or hazing), and unbeknown to the defendant, at least two other members of the organization have been convicted of a combination of offenses designated as a pattern of criminal gang activity, with no nexus to the organization (e.g., threatening a simple assault), *see* T.C.A. § 40-35-121(a)(1)(B), (a)(3)(A)(i), & (a)(4)(ii), Section 40-35-121(b) can come into play. Officers in such organizations need to be particularly alert. *See* T.C.A. § 40-35-121(e). The 2013 amendment did little to change this scenario. It clarified and expanded what is considered a criminal gang offense, enumerating

We note that Section 40-35-121(b) purportedly imposes a sentence enhancement rather than an independent criminal offense as in *Scales*. However, we believe that distinction to be inconsequential. Section 40-35-121(b) imposes mandatory criminal punishment wholly aside from any consideration of the nature of the underlying offense, of the previous criminal history of the offender, or of how gang affiliation increases the future threat to society posed by the offender. *Cf. Dawson v. Delaware*, 503 U.S. 159, 166-67 (1992) (holding that the First Amendment prohibited introduction of the fact of a convicted defendant's mere membership in the Aryan Brotherhood without additional evidence that the gang affiliation was relevant to help prove an aggravating circumstance at the sentencing hearing). Instead, the statute enhances punishment solely on the mere fact of one's affiliation with a gang which makes it easily distinguishable from other discretionary sentencing enhancement factors that are relevant for reaching a personalized sentencing decision.

Many states have statutes specifically targeting gang-related crimes, and many state courts have upheld their gang enhancement statutes against constitutional challenges. *See, e.g.*, *Rodriguez v. State*, 671 S.E.2d 497 (Ga. 2009); *People v. Gardeley*, 927 P.2d 713 (Cal. 1996). However, Section 40-35-121(b), like the statute in *O.C.*, is uniquely distinguishable from other statutes that have survived constitutional challenges because it lacks a textual basis conditioning enhanced punishment on gang-related criminal conduct by the defendant. *Cf. Rodriguez*, 671 S.E.2d at 503 (holding that Georgia's gang statute did not violate due process or the First Amendment because the statute required participation in the commission of a criminal act and did not punishment gang membership alone); *State v. Williams*, 773 N.E.2d 1107, 1112 (Ohio Ct. App. 2002) (holding that Ohio's gang statute did not "impermissibly establish guilt by association alone" because it "requires that the active member with guilty knowledge has specific intent or purpose to further the group's criminal conduct before they may be prosecuted"); *Klein v. State*, 698 N.E.2d 296 (Ind. 1998) (upholding gang statute where "[m]embership in a gang, by itself, does not provide the basis for prosecution for criminal gang activity"); *Gardeley*, 927 P.2d at 725 (observing that California's "STEP Act does not criminalize mere gang membership; rather it imposes increased criminal penalties only when the criminal conduct is felonious and committed not only 'for the benefit of, at the direction of, or in association with' a group that meets the specific statutory conditions of a 'criminal street gang,' but also with the 'specific intent to promote, further

some twenty-seven specific crimes. Interestingly, several misdemeanors remain on the list. *See* T.C.A. § 40-35-121(a)(3)(B).

-46-

or assist in any criminal conduct by gang members'"").[11] Nearly all gang enhancement statutes in this country contain specific language limiting the reach of those statutes only to offenses that possess a nexus to a defendant's gang affiliation, and therefore, a defendant's own criminal conduct. *See, e.g.*, Cal. Penal Code § 186.22(b)(1) (enhancing a felony "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members"); D.C. Code § 22-951(b)(1) (making it a crime to "knowingly and willfully participate in any felony or violent misdemeanor committed for the benefit of, at the direction of, or in association with any other member or participant of that criminal street gang"); Ga. Code Ann. § 16-15-4(b) (enhancing punishment for enumerated offenses committed "with the intent to obtain or earn membership or maintain or increase . . . status or position in a criminal street gang"); Idaho Code Ann. § 18-8503 (enhancing punishment for enumerated offenses "committed for the benefit or at the direction of, or in association with, any criminal street gang member"); Ind. Code Ann. § 35-50-2-15(b) (enhancing punishment for a felony committed by a gang member "at the direction of or in affiliation with a criminal gang[, or] with the intent to benefit, promote, or further the interests of a criminal gang, or for the purposes of increasing the person's own standing or position with a criminal gang"); La. Rev. Stat. Ann. § 15:1403(B) (enhancing punishment for a felony "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the intent to promote, further, or assist in the affairs of a criminal gang"); Mich. Comp. Laws Ann. § 750.411u (enhancing punishment when a person "who is an associate or a member of a gang commits a felony or attempts to commit a felony and the person's association or membership in the gang provides the motive, means, or opportunity to commit the felony, the person is guilty of a felony"); *see also* Fla. Stat. Ann. § 874.04; Iowa Code Ann. § 723A.2; Minn. Stat. Ann. § 609.229; Miss. Code Ann. § 97-44-19; Mo. Ann. Stat. § 578.425; Nev. Rev. Stat. Ann. § 193.168; Tex. Penal Code Ann. § 71.02; Utah Code Ann. § 76-3-203.1; Va. Code Ann. § 18.2-46.2.

As a matter of clarification, we emphasize that the defendants have not alleged that Section 40-35-121(b) violates a fundamental right to expressive association with a criminal street gang, but we are aware that there are arguably additional First Amendment

---

[11] *See also State v. Ochoa*, 943 P.2d 814 (Ariz. Ct. App. 1997); *State v. Baldenegro*, 932 P.2d 275 (Ariz. Ct. App. 1996); *Helton v. State*, 624 N.E.2d 499, 508-09 (Ind. Ct. App. 1993); *State v. Woodbridge*, 791 N.E.2d 1035 (Ohio Ct. App. 2003); *State v. Rushton*, 785 N.E.2d 654 (Ohio Ct. App. 2003); *State v. Bennett*, 782 N.E.2d 101 (Ohio Ct. App. 2002); *State v. Stallings*, 778 N.E.2d 1110 (Ohio Ct. App. 2002).

implications.[12]  Because the defendants have not approached their due process challenge from this angle, we make no decision on whether First Amendment protection exists for such an association.  Tenn. R. App. P. 13(b) ("Review generally will extend only to those issues presented for review.").

We turn now to the State's argument that Section 40-35-121(b) was constitutionally applied to the defendants in this case because the evidence established that the underlying offenses were gang-related.  We disagree.  "In contrast to a facial challenge, which involves the constitutionality of the statute as written, an as applied challenge to the constitutionality of a statute is evaluated considering how it operates in practice against the particular litigant and under the facts of the instant case, not hypothetical facts in other situations."  *State v. Crank*, 468 S.W.3d 15, 24 n.5 (Tenn. 2015) (quoting *City of Memphis v. Hargett*, 414 S.W.3d 88, 107 (Tenn. 2013)) (internal quotations omitted).  A statute is unconstitutional on its face when "no set of circumstances exists under which the statute, as written, would be valid."  *Waters*, 291 S.W.3d at 882.  In this case, as it would be in any other case, Section 40-35-121(b)

---

[12] The defendants did not raise a First Amendment argument to the court below and have not properly raised one in this Court either.  Although some of their filings make offhand suggestions that the statute is overbroad, this argument was never developed, and the defendants have not otherwise argued that Section 40-35-121(b) infringes their right to expressive association under the First Amendment.  *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").  However, we take this opportunity to note that the scope of associational rights for gang members under the First Amendment is far from clear.  *See, e.g.*, Beth Bjerregaard, *The Constitutionality of Anti-Gang Legislation*, 21 Campbell L. Rev. 31, 36-37 (1998) (identifying disagreement among commentators and case law).  *Compare Scales*, 367 U.S. at 229 (commenting that "[i]f there were a . . . blanket prohibition of association with a group having both legal and illegal aims, there would indeed be a real danger that legitimate political expression or association would be impaired") *with Roberts v. United States Jaycees*, 468 U.S. 609, 620 (1984) (acknowledging a constitutionally protected freedom of association for "intimate human relationships" as "a fundamental element of personal liberty" and also "a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion") *and City of Chicago v. Morales*, 527 U.S. 41, 53 (1999) (plurality opinion) (commenting that the "impact" of the anti-gang loitering statute before it "on the social contact between gang members and others does not impair the First Amendment 'right of association' that [previous] cases have recognized" (citing *Dallas v. Stanglin*, 490 U.S. 19, 23-25 (1989))) *and Rumsfeld v. F.A.I.R.*, 547 U.S. 47, 68 (2006) ("We have recognized a First Amendment right to associate for the purpose of speaking, which we have termed a 'right of expressive association'" (citing *Boy Scouts of America v. Dale*, 530 U.S. 640, 644 (2000)).  At least one case has expressly held that the First Amendment generally does not afford associational protection to gang members.  *People ex rel. Gallo v. Acuna*, 929 P.2d 596, 608-09 (Cal. 1997) (holding that a civil injunction forbidding gang members from publicly appearing with other gang members in a particular neighborhood did not implicate any associational protections of the First Amendment).

unconstitutionally imposes criminal punishment for the defendants' mere affiliation with the Five Deuce Hoover Crips. Because the statute's text lacks a nexus requirement, the defendants' sentences were not enhanced because they committed gang-related crimes; instead, the defendants' sentences were enhanced because other individuals with whom they have a connection have previously engaged in criminal activity and have a history of criminal convictions.

Although we sympathize with the State's argument because it is amply apparent that the underlying offenses in this case were gang-related, we refuse to read a nexus requirement into the statute to eliminate its constitutional shortcomings. We respect the General Assembly's efforts to combat the scourge of criminal gang activity in our state, but it is not within our authority to rewrite this statute.

We must now look to the question of severability of Section 40-35-121(b). *New York v. United States*, 505 U.S. 144, 186 (1992). "Severability is of course a matter of state law." *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996). "Under the doctrine of elision, a court may, under appropriate circumstances and in keeping with the expressed intent of a legislative body, elide an unconstitutional portion of a statute and find the remaining provisions to be constitutional and effective." *Lowe's Companies, Inc. v. Cardwell*, 813 S.W.2d 428, 430 (Tenn. 1991). "The doctrine of elision is not favored," *Gibson Cty. Special Sch. Dist. v. Palmer*, 691 S.W.2d 544, 551 (Tenn. 1985) (citing *Smith v. City of Pigeon Forge*, 600 S.W.2d 231 (1980))," and "Tennessee law permits severance only when 'it is made to appear from the face of the statute that the legislature would have enacted it with the objectionable features omitted,'" *Memphis Planned Parenthood, Inc. v. Sundquist*, 175 F.3d 456, 466 (6th Cir. 1999) (citing *State v. Harmon*, 882 S.W.2d 352, 355 (Tenn. 1994)). "In determining whether a provision should be severed, the proper inquiry is whether the legislature "would choose, on the one hand, having no [Code section 40-35-121] at all and, on the other, passing [Code section 40-35-121] without" subsection (b). *Memphis Planned Parenthood, Inc.*, 175 F.3d at 466.

"The inclusion of a severability clause in the statute has been held by this Court to evidence an intent on the part of the legislature to have the valid parts of the statute in force if some other portion of the statute has been declared unconstitutional." *Gibson Cty. Special Sch. Dist.*, 691 S.W.2d at 551 (citing *Catlett v. State*, 336 S.W.2d 8 (1960)). Although Section 40-35-121 does not contain a specific severability clause, the Code does include a general severability provision:

It is hereby declared that the sections, clauses, sentences and parts of the Tennessee Code are severable, are not matters of mutual essential inducement, and any of them shall be exscinded if the code would otherwise be unconstitutional or ineffective. If any one (1) or more sections, clauses, sentences or parts shall for any reason be questioned in any court, and shall be adjudged unconstitutional or invalid, such judgment shall not affect, impair or invalidate the remaining provisions thereof, but shall be confined in its operation to the specific provision or provisions so held unconstitutional or invalid, and the inapplicability or invalidity of any section, clause, sentence or part in any one (1) or more instances shall not be taken to affect or prejudice in any way its applicability or validity in any other instance.

T.C.A. § 1-3-110. "This legislative endorsement of elision 'does not automatically make it applicable to every situation; however, when a conclusion can be reached that the legislature would have enacted the act in question with the unconstitutional portion omitted, then elision of the unconstitutional portion is appropriate.'" *State v. Crank*, 468 S.W.3d 15, 29 (Tenn. 2015) (quoting *In re Swanson*, 2 S.W.3d 180, 189 (Tenn. 1999)).

Under the same analysis of section (b) above, Section 40-35-121(e) also fails for lack of a nexus.[13] When read in conjunction with subsections (b) and (e), subsections (a)(1), (2), (3) and (4) violate the constitutional principles of due process. However, subsection (c) contains the necessary nexus language ( "*. . . for the purpose of and with the intent to . . .*") (emphasis added) and thus meets the constitutional requirement of due process.[14] Furthermore, when read in conjunction with subsection (c), subsection (a) and all its subparts meet due process requirements.

As near as one body can reason the collective minds of another body, we believe the legislature would choose the survival of subsection(c) and the remaining provisions of Section 40-35-121 as opposed to the death of the entire statute. The statutory scheme

---

[13] "A criminal gang offense committed by a defendant who was a criminal gang member at the time of the offense shall be punished two (2) classifications higher than the classification established by the specific statute creating the offense committed if the criminal gang member was also a leader or organizer of the criminal gang at the time the offense was committed." T.C.A. § 40-35-121(e).

[14] "A criminal gang offense committed by a defendant who was not a criminal gang member at the time of the offense but who committed the offense for the purpose of and with the intent to fulfill an initiation or other requirement for joining a criminal gang as defined in subdivision (a)(1) shall be punished one (1) classification higher than the classification established by the specific statute creating the offense committed." T.C.A. § 40-35-121(c).

allows Section 40-35-121(c) to operate independently from subsections (b) and (e). Because the latter provisions are not interwoven with the statutory mechanics of subsection (c), this statute is unlike previous statutes that have been wholly invalidated where the unconstitutional portion affects the substantive nature or scope of the remaining provisions. *See, e.g.*, *State v. Tester*, 879 S.W.2d 823, (Tenn. 1994) (refusing to apply the doctrine of elision where resulting statutory scheme would apply statewide rather than to only three counties); *Frost v. City of Chattanooga*, 488 S.W.2d 370 (Tenn. 1972) ("To elide the [unconstitutional] provisions . . . defining the category of affected municipalities would result in an incomplete statute. Either all municipalities would be included or this Court would be faced with the problem of establishing a class of municipalities that accords with state law."). So, likewise, subsection (a) would survive when applied in conjunction with subsection (c) and the remaining provisions. Therefore, we conclude that Section 40-35-121(b) and Section 40-35-121(e) may be permissively elided, and the remainder of Section 40-35-121 remains effective.

## 4. Cruel and Unusual Punishment

Defendants Bonds, Bishop, and Sullivan also argue that Section 40-35-121 violates that Eighth Amendment's prohibition of cruel and unusual punishment because it offends the contemporary standards of decency and because it results in a sentence that is grossly disproportionate to the crime. We note that other states have rejected Eighth Amendment challenges to sentences imposed under gang enhancement statutes, *see, e.g.*, *Armstrong v. State*, 22 N.E.3d 629, 639 (Ind. Ct. App. 2014) (noting that the defendant "does not point to any authority holding that a sentence based upon a criminal gang enhancement statute is unconstitutional under the Eighth Amendment"), and we likewise have no trouble concluding that Section 40-35-121's imposition of heightened punishment for gang-related offenses by increasing the sentencing range of the offense does not offend the proportionality requirements of the Eighth Amendment. The defendants are not entitled to relief on this basis.

## 6. Closing Argument

Defendants Bonds, Bishop, and Sullivan argue that the trial court erred in denying them the opportunity to make closing arguments to the jury before it decided the gang enhancement charges. Because we have already concluded above that this phase of the trial was not merely a sentencing hearing, we agree that the State and the defendants should have been permitted to make closing arguments to the jury. *See* Tenn. R. Crim. P. 29.1.

## 7. Sufficiency of Evidence for the Third Phase – Gang Offense Enhancement

Lastly, Defendants Bonds, Bishop, and Sullivan argue that their convictions under Section 40-35-121(b) were not supported by sufficient evidence. We disagree.

The State relied on the evidence presented during the first phase of the trial to prove that the underlying offenses were criminal gang offenses as defined by Section 40-35-121(a)(3)(A)(i). As recounted above, the evidence clearly established that the defendants perpetrated the underlying criminal offenses of attempted second degree murder, aggravated assault, and possession of a firearm during the commission of a dangerous felony while knowingly causing bodily injury to another person. They beat the victim to within an inch of his life. This conduct satisfied the statutory definition of a criminal gang offense.

The State also introduced ample evidence that Defendants Bonds, Bishop, and Sullivan were each members of a criminal gang known as the Five Deuce Hoover Crips. During the first phase of the trial, the victim, a former member of the gang, identified each of the defendants as gang members, satisfying Section 40-35-121(a)(2)(C). Detective Walker testified that Defendant Bonds was arrested as a juvenile for participating in a "gang beat in" of a gang initiate and had also been recently arrested for reckless endangerment during which he had been witnessed shouting "Fifty-two Hoover" before shots were fired from a car. Both of these facts would satisfy Section 40-35-121(a)(2)(F). Defendant Bonds also has "Fifty-Two Hoover" tattooed on his right arm and "Five Two" on his neck with a star, which would satisfy Section 40-35-121(a)(2)(D). Detective Walker testified that Defendant Bishop had been confirmed as a gang member by the Sheriff's Office because "he did graffiti inside of [the] jail, wearing gang colors, known gang association of known gang members, felony criminal history, arrested on a violent crime, confirmed through an outside gang unit, and another weapons arrest." Graffiti is physical evidence identifying him as a gang member which satisfies Section 40-35-121(a)(2)(G). Wearing gang colors satisfies Section 40-35-121(a)(2)(D). Detective Walker testified that Defendant Sullivan was confirmed by the Sheriff's Office as a gang member because "he had points for graffiti, known gang association with known gang members, felony criminal history, outside jurisdictional information from a confirmed source, arrested on a violent crime, gang-specific brands or tattoos, and named as a gang member in correspondence."

Based on the victim's testimony and the testimony of Detective Walker, a criminal gang expert familiar with the Five Deuce Hoover Crips, it was plainly apparent that the Five Deuce Hoover Crips boasts membership of three or more people as required by Section 40-35-121(a)(1); there were four members on trial, the victim was a member at the time of the offenses, and numerous other individuals were determined by the Sheriff's

-52-

Office to be members based on the contents of the gang file, which we will not regurgitate here. Detective Walker testified that the activities of the Five Deuce Hoover Crips has included committing crimes such as "drug dealing mostly, robberies, agg[ravated] assaults, attempted murder, stuff like that," which satisfies the requirement of Section 40-35-121(a)(1)(A).

To prove that two or more of the members of the Five Deuce Hoover Crips have engaged in a "pattern of criminal gang activity" as required by Section 40-35-121(a)(1)(B), the State introduced certified judgments of convictions for other gang members, for felonies such as possession of a controlled substance with intent to sell, attempted possession of a controlled substance with intent to sell, aggravated assault, facilitation to commit aggravated robbery, aggravated burglary, and attempted aggravated burglary. The requirements of the statute were satisfied because there were judgments for three drug-related felony convictions[15] which occurred on different occasions within a period of five years and which were committed by at least two individuals as required by the statute.[16] Section 40-35-121(a)(3)(A)(ii) defines an eligible criminal gang offense as any crime that "results, or was intended to result, in the defendant's receiving income, benefit, property, money or anything of value . . . from the illegal sale . . . of a controlled substance . . . ."

---

[15] Bekweri William Bost was convicted of possession of cocaine not over .5 grams with intent to sell, which was committed on September 24, 2005. James H. Coney was convicted of attempted possession of cocaine with intent to sell, which was committed on June 27, 2006. Adrian Dezekiel Thomas was convicted of possession of cocaine over .5 grams with intent to sell, which was committed on February 1, 2008.

[16] Although the statute's definition of a pattern of criminal gang activity only requires a minimum of two different eligible felonies committed by two different gang members to satisfy its criteria, the State entered into evidence more convictions than required. We note that the judgments for at least some of the non-drug-related offenses may not have constituted legally sufficient proof under the statute. For crimes committed prior to July 1, 2013, Section 40-35-121(a)(3)(A)(i) defines a criminal gang offense as any criminal offense "[d]uring the perpetration of which the defendant knowingly causes, or threatens to cause, death or bodily injury to another person." It appears to us that a mere judgment form would be inadequate proof that its underlying felony was perpetrated in a manner that entailed the causing or threatening of death or bodily injury, unless the elements of the crime necessarily encompassed such conduct. For example, as currently written, one could commit aggravated assault with a reckless mens rea, but that degree of mental awareness would not support Section 40-35-121(a)(3)(A)(i)'s requirement that the crime be committed knowingly. It's also quite simple to conceive of a hypothetical where one could commit aggravated burglary, i.e., the entering of a habitation with the intent to commit a felony, without ever threatening or causing death or bodily injury and without ever intending to receive anything of value from the trespass. Such a problem would not arise however, for crimes committed after July 1, 2013, because Section 40-35-121(a)(3)(B) simply enumerates the eligible criminal offenses without any qualifying language that would require proof of the facts of the underlying crime.

Therefore, the evidence was sufficient for a rational jury to find beyond a reasonable doubt that the defendants were members of a criminal gang, as defined by statute, and that they committed a criminal gang offense, as defined by statute. They are not entitled to relief on this issue.

## C. Sentencing

Defendant Bishop argues that the trial court erred by finding that his criminal history made him a multiple offender subject to Range II sentencing. Defendant Sullivan argues that the trial court abused its discretion by ordering him to serve an excessive sentence. Each of these arguments has been rendered moot by the foregoing conclusions, but we will address them anyway to facilitate additional appellate review.

## 1. Offender Classification

Tennessee Code Annotated section 40-35-106 classifies a defendant as a multiple offender if he has a "minimum of two (2) but not more than four (4) prior felony convictions within the conviction class, a higher class, or within the next two (2) lower felony classes." For purposes of this section, generally, each conviction must not have occurred during the same twenty-four-hour period.

At the sentencing hearing on July 25, 2013, the State introduced the presentence investigation reports into evidence. The State also asked the trial court to take notice of the certified judgments for three federal convictions of drug-related crimes committed by Defendant Bishop, which were introduced during the second phase of the trial on the felon in possession of a firearm charge. After hearing argument from counsel, the trial court determined that Defendant Bishop was a Range II, multiple offender and sentenced him to thirty-two years for the attempted murder, to fifteen years for the aggravated assault, and to five years for the possession of a firearm. The first two sentences were run concurrently, but the third sentence was run consecutively to the attempted murder sentence by operation of statute.

The State entered a single certified judgment from the District Court of the United States for the Eastern District of Tennessee. That judgment showed that Defendant Bishop pled guilty to three offenses: possession with intent to distribute five grams or more of cocaine base, carrying a firearm during and in relation to a drug trafficking crime, and possession within intent to distribute cocaine base. The same offense date of May 26, 2001, is listed for the first two convictions, and the offense date of January 19, 2001, is listed for the third conviction. Aside from the firearm conviction, the two

separate drug convictions are sufficient to make Defendant Bishop a multiple offender because they occurred on different days.

In his appellate brief, Defendant Bishop makes a passing assertion that the trial court "neglected to determine both whether the convictions . . . were 'within the conviction class, a higher class, or within the next two (2) lower felony classes.'" Section 40-35-106(b)(5) states that "[i]n the event that a felony from a jurisdiction other than Tennessee is not a named felony in this state, the elements of the offense shall be used by the Tennessee court to determine what classification the offense is given." Although the trial court did not expressly consider whether the federal convictions had Tennessee analogues, Defendant Bishop has not suggested or shown that there was any violation of the statute by utilizing those convictions to establish his offender classification. Defendant Bishop bears the burden of showing that his sentence is improper. *State v. Cooper*, 321 S.W.3d 501, 505 (Tenn. 2010). Accordingly, he is not entitled to relief.

2. Excessiveness

When a defendant challenges the length or manner of service of a within-range sentence, this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). This presumption applies to "within-range sentencing decisions that reflect a proper application of the purposes and principles of the Sentencing Act." *Bise*, 380 S.W.3d at 707. A trial court abuses its discretion in sentencing when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997) (citing *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996)). This deferential standard does not permit an appellate court to substitute its judgment for that of the trial court. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998).

Our supreme court has "continued to emphasize the need for trial courts to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *State v. King*, 432 S.W.3d 316, 322 (Tenn. 2014) (quoting *Bise*, 380 S.W.3d at 705-06 n.41). Additionally, the sentence imposed "should be no greater than that deserved for the offense committed" and also "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4).

Based on his criminal history, the trial court found Defendant Sullivan to be a multiple offender. He received a thirty-five-year sentence for the attempted murder, eighteen years for the aggravated assault, and five years for the possession of a firearm. The first two sentences were run concurrently, and the last sentence and the first sentence were run consecutively.

During its consideration, the trial court identified five enhancing factors. Because Defendant Sullivan had numerous misdemeanor convictions and one additional felony conviction, the trial court found that he had a previous criminal history in addition to that necessary to establish the sentencing range. *See* T.C.A. § 40-35-114(1). The trial court also found that the injuries inflicted upon the victim were particularly great given their life-threatening severity and crippling impact on the victim's life. *See* T.C.A. § 40-35-114(6). The trial court found that previous attempts at alternative sentencing involving release into the community had failed because Defendant Sullivan's criminal record included multiple probation violations and a history of misconduct even while in custody. *See* T.C.A. § 40-35-114(8). The trial court noted that Defendant Sullivan possessed a firearm during the commission of the charged offense. *See* T.C.A. § 40-35-114(9). And lastly, the trial court found that the charged offense resulted in serious bodily injury and Defendant Sullivan already had been previously convicted of a felony that resulted in serious bodily injury. *See* T.C.A. § 40-35-114(11).

After reviewing the record, we determine that the trial court did not abuse its discretion in sentencing Defendant Sullivan. The trial court clearly identified each enhancing factor upon which it relied and explained why each was applicable. Defendant Sullivan complains that the trial court did not explain how much weight it was placing on each factor, but nothing in the record suggests that the trial court placed undue emphasis on an improper factor. We are satisfied that Defendant Sullivan's sentences comport with the purposes and principles of our sentencing scheme and are not excessive. *See* T.C.A. §§ 40-35-102, -103. He is not entitled to relief on this basis.

## III. Conclusion

Because there was no error during the guilt phase of the trial on the defendants' underlying convictions for attempted second degree murder, aggravated assault, and possession of a firearm during the commission of a dangerous felony, those convictions are affirmed. Accordingly, the trial court's judgments as to Defendant Robinson are affirmed. However, because Tennessee Code Annotated section 40-35-121(b) violates the Due Process Clause of the Fourteenth Amendment for lack of a nexus requirement between the underlying offenses and the gang affiliation of Defendants Bonds, Bishop, and Sullivan, their criminal gang enhancements are vacated, their judgments are reversed,

and the case is remanded to the trial court for modification of the judgments and a new sentencing hearing based solely on the underlying offenses.

_____
TIMOTHY L. EASTER, JUDGE