IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs October 2, 2018

**STATE OF TENNESSEE v. MARIO WALLS**

**Appeal from the Criminal Court for Shelby County**
No. 17-00301        Chris Craft, Judge

_____

**No. W2018-00527-CCA-R3-CD**

_____

A Shelby County Criminal Court Jury convicted the Appellant, Mario Walls, of attempted second degree murder, and the trial court imposed a sentence of thirty years in the Tennessee Department of Correction. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his conviction, contending that the proof did not show he was aware his conduct was reasonably certain to result in the victim's death. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ALAN E. GLENN, J., joined.

Tony N. Brayton (on appeal) and Michael Johnson and Thomas Williams (at trial), Memphis, Tennessee, for the Appellant, Mario Walls.

Herbert H. Slatery III, Attorney General and Reporter; Ronald A. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; Nicole Germain and Meghan Fowler, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

The Appellant was indicted for attempted first degree murder of the victim, Latonia Reeder, after an incident that occurred in the early morning hours of October 18, 2014.

At trial, the victim testified that she first met the Appellant around August 2014 through Tajaylan Frison, who was the boyfriend of her cousin, Adrienne Brown. The victim, Mr. Frison, and the Appellant worked the evening shift at Technicolor. The victim drove Mr. Frison to and from work almost every day, and after Mr. Frison introduced her to the Appellant, she agreed to let the Appellant ride to and from work in exchange for gas money.

The victim said that Mr. Frison told her the Appellant wanted to pursue a relationship with her. The victim and the Appellant dated for a couple of weeks. They mostly talked and "h[u]ng out" but went on one "official outing date" during which they had sex. The victim initially wanted the relationship. However, only two months into the relationship, the Appellant wanted to move in with her and her daughter, and her interest waned because the Appellant was "moving too fast." The victim tried to make the Appellant slow his advances, but he continued to make overtures, such as offering to purchase cable television for the victim and her daughter and coming to the victim's house when she was asleep and knocking on her door for hours. The victim ultimately told the Appellant that she did not want to live with him, that she recently had ended a long-term relationship, and that she did not want to date him.

A week or two later, the victim arrived at work at 3:00 p.m. on October 17, 2014. She was "a little late" and wanted to get inside to "clock in on time," but the Appellant tried to stop her in the parking lot to talk. The victim told the Appellant that she had put belongings he had left at her house in a bag and that the bag was in her Ford Expedition. She gave him the keys to her vehicle so he could get his belongings, and she went inside.

During a company meeting later that day, the Appellant again tried to talk to the victim. After the meeting, Mr. Frison informed her that the Appellant had left work but that he would return. When the victim's shift ended at 11:00 p.m., she found the Appellant and Mr. Frison in the parking lot, and all three got into her Expedition. They drove to a nearby gas station but were unable to get gas because of a problem with the pump. They then drove to a different gas station. During the drive, the Appellant asked the victim to take him somewhere, but she refused, explaining that it was out of her way. They did not argue about her refusal, but the Appellant tried to convince her to change her mind.

The victim recalled that they arrived at the second gas station at approximately 11:30 p.m. or midnight but that they could not get gas because the pumps were crowded. They parked, and the Appellant sent Mr. Frison into the store. The victim, who was in the driver's seat, said nothing because she did not "want to be confrontational with" the Appellant. The Appellant, who was in the front passenger seat, suddenly pulled out a knife. Upon seeing the knife, the victim was frightened for her life. The Appellant held the knife in front of him and told her to get in the backseat.

The victim said that soon after she got into the backseat, the Appellant suddenly cut, sliced, and stabbed her in her shoulder and neck. The Appellant told the victim that she did not want him, then he choked her and told her to "[s]hut up." He stabbed her again in her left side. The victim tried to get out of the car but could not open the back doors because the safety locks were on. The Appellant repeated his command to "[s]hut up" and again started choking her. The Appellant stabbed her on the right side of her abdomen and tried to "poke" her with the knife, but she prevented it by wildly flailing her arms and legs.

The victim begged for her life and apologized for whatever she had done to the Appellant. The Appellant responded "that he was going to teach [her] a lesson." He removed the keys from the ignition and then stabbed her in the middle of her neck. The victim thought the Appellant was determined to kill her. The Appellant tried to cut her face, but she blocked the knife with her right hand, which caused a bad cut. The knife hit her chin and the left side of her cheek. The Appellant jumped into the driver's seat and started to drive away. The victim grabbed the steering wheel, and the Expedition crashed into a car parked near the gas pumps, but the Appellant did not stop.

The victim said that she and the Appellant continued to wrestle over the steering wheel after the crash. Eventually, she was able to jump from the backseat into the front passenger seat, open the passenger door, and run away. The Appellant caught her, and they "tussl[ed]." The Appellant picked her up to carry her back to the Expedition. The victim, who was weak and close to fainting, "pretended to have a seizure," and the Appellant dropped her and walked away. When the Appellant was gone, the victim jumped up and ran to get help.

The victim said that she eventually saw a man in a security vehicle and ran toward it. She pleaded for help, saying someone was trying to kill her, and grabbed the vehicle's door handle. However, no one stopped to help her. The victim went underneath a bridge and found a man who was willing to help her. They walked together and found the security guard sitting in his vehicle calling for help. The victim sat on the curb near the security vehicle. The victim said she was bleeding from her neck, hand, abdomen, side, and "just everywhere." She applied pressure to her neck and her side to try to stop the bleeding until an ambulance and the police arrived.

The victim said that she immediately had surgery and was hospitalized for approximately one week. She could not walk for two months and was unable to care for herself for a long time. Her daughter, sister, and mother cared for her. The victim showed the jury her scars, including a scar on her neck, and noted that she had never regained total mobility in her neck.

Tajaylan Frison testified that around 10:00 p.m. on October 17, 2014, he, the victim, and the Appellant left work together in the victim's Ford Expedition. The Appellant told Mr. Frison that he had been fired, but the Appellant seemed "calm" and "normal." On the drive home, Mr. Frison, the victim, and the Appellant stopped at a store then drove to an apartment complex. When the Appellant wanted to go to another store, they left the apartment complex and went to a gas station on Millbranch Road. Mr. Frison did not hear the Appellant and the victim argue during the drive. Upon arriving at the store, the Appellant gave Mr. Frison five dollars and sent him into the store to buy some candy. When Mr. Frison returned from the store, the Appellant asked him to go back and purchase two sodas. Shortly after entering the store the second time, Mr. Frison heard the Expedition's engine start and saw the Appellant hit a car as he "pulled off fast, like something's going on." Mr. Frison stated that the Appellant and the victim had never abandoned him and that he was concerned. Mr. Frison said that on the afternoon of October 18, 2014, he went to the police department and identified the Appellant from a photograph array.

On cross-examination, Mr. Frison said that he did not recall telling the police that the Appellant and the victim argued in the vehicle. However, after being shown his police statement, Mr. Frison acknowledged, "They had a little disagreement." Mr. Frison did not recall how long the argument lasted, but he knew the argument was not about work.

Demarcus Stewart, a security guard with Allied Barton Universal, testified that in the early morning hours of October 18, 2014, he was driving on Millbranch Road when a woman ran into the middle of the street. He tried to drive away, but she held onto the passenger door handle, and he stopped the vehicle. She was screaming, bleeding, and seemed distressed. She hit the window with one of her arms, and Mr. Stewart realized that she was asking for help. He rolled down one of the car's windows and told her he would call the police. After calling 911, Mr. Stewart stayed with the victim until the police arrived.

Candace Puryear, the victim's daughter, testified that the victim usually drove the Appellant home from work and that Ms. Puryear had been given the Appellant's telephone number for safety reasons. She did not think the victim and the Appellant had any relationship outside of work.

Ms. Puryear said that between 2:30 and 3:00 a.m. on October 18, 2014, the victim had not come home, and she called the Appellant because she was concerned. Eventually, the Appellant answered the telephone. When Ms. Puryear asked about the victim, the Appellant responded that he was upset with the victim and that he had killed her.

Memphis Police Officer Dartelle Joyner testified that on October 18, 2014, he responded to Millbranch Road and Berwind Road and saw the victim sitting on the curb, "drenched in blood," with "one arm on her neck and one arm wrapped around her waist." The victim told Officer Joyner that she had escaped from the Appellant around Millbranch Road and Timothy Road, which was approximately two blocks south of where she was sitting. Officer Joyner went to that area. He saw blood spatter and some of the victim's belongings in the street, which indicated a struggle had ensued there.

Troy Brown, a firefighter and paramedic with the Memphis Fire Department, testified that when he arrived, the victim was sitting on the curb, bleeding and in apparent distress. She seemed to be in shock and appeared to have "just suffered a traumatic injury." The victim had seven stab wounds: three to the neck, three to the abdomen, and one to the back shoulder. Immediately upon arrival at the hospital, the victim was taken to "shock trauma for treatment."

Memphis Police Sergeant Shane Tarena testified that on October 18, 2014, he was dispatched to Millbranch Road and Timothy Road as a crime scene investigator. Sergeant Tarena noted that the victim had walked from Millbranch Road and Timothy Road to where she was found, leaving a trail of blood; however, more blood was at the Millbranch Road and Timothy Road scene.

Officer Marco Reed testified that on October 18, 2014, he arrested the Appellant. At the time of the arrest, he did not see any visible injuries on the Appellant. After booking, Officer Reed collected the Appellant's clothes. Officer Reed noticed what appeared to be blood on the front knee area of the Appellant's blue jeans and "some sort of stain" on the back of the Appellant's shirt.

Officer David Payment testified that on October 20 or 21, 2014, he was working as a crime scene investigator, and he searched the victim's Expedition. Officer Payment said that there was "a lot of blood in that vehicle" and that the only part of the vehicle where no blood was found was "in the far right back area . . . behind the rear seat." Officer Payment found a knife with a six inch blade in a "pile of items" in the front passenger floorboard.

The thirty-nine-year-old Appellant testified that after the victim began driving him home from work, he wanted a relationship with her and thought she felt the same. The Appellant said that their relationship "was all right" but that she told "a lot of lies."

The Appellant recalled that on one occasion, he spent the night at the victim's apartment but left to go to his sister's apartment when the victim received a call from a friend or a boyfriend. The Appellant explained that he "didn't want no drama."

- 5 -

However, he returned to the victim's apartment to discuss their relationship after she sent him text messages. The Appellant said they were "kind of taking it slow."

The Appellant said that as of October 17, 2014, he and the victim were friends but were not in a romantic relationship. That day, the Appellant, who worked two jobs, had to finish performing some maintenance work before he could leave for his job at Technicolor. He sent the victim text messages asking her for a ride so he would not be late for work, but she never returned his calls or text messages. While the Appellant was walking to work, he saw her drive past him, but he was able to get a ride from another co-worker.

The Appellant said that upon his arrival at Technicolor, he was wearing his maintenance work clothes. He saw the victim in the parking lot and asked to borrow her keys so he could change his shirt and store his cellular telephones in her vehicle. After the victim refused to give him her keys, the Appellant went inside, spoke with his "line leader," and "ended up leaving." He returned later to retrieve his debit card from the victim's vehicle.

The Appellant said that after the victim's shift ended, he and Mr. Frison got into her vehicle. During the drive home, the Appellant and the victim talked about their relationship. They stopped at a gas station but did not get gas because the Appellant refused to pay for it. The Appellant told the victim he wanted to go to his daughter's apartment, but the victim refused to take him. The Appellant told her he thought he could walk if she would leave him at a certain gas station. They stopped at the Appellant's aunt's apartment, bought marijuana, and then drove to a gas station to buy a few items. As they drove, the victim complained about the Appellant's flirting with women at work.

The Appellant said that after Mr. Frison went inside the store, the Appellant and the victim talked about money he had given her for safekeeping but that she had spent. Mr. Frison returned to the vehicle, but he had forgotten to buy sodas for the Appellant and returned to the store. The victim then asked the Appellant if he was "going to quit playing" with her, and she "said she was sick and tired of [the Appellant] flirting and disrespecting her." The Appellant responded that they were only friends.

The Appellant said the victim suddenly pulled out a knife, and he "blacked out." When the Appellant regained consciousness, he saw that the victim was bleeding and needed medical assistance. He decided to drive her to a hospital. As he drove, the victim repeatedly hit him, which caused him to hit a vehicle before leaving the gas station parking lot. The Appellant told the victim to "chill."

The Appellant said that when he turned off Millbranch Road onto Timothy Road, and he stopped the vehicle because the victim kept hitting him. The victim jumped out of

the vehicle, ran away, and collapsed. The Appellant tried to pick up the victim then asked her to walk back to the vehicle. The victim did not comply but said that she loved him and asked him not to leave her. The Appellant said, "She picked a fine time to say something like that." He walked away because he was frustrated by "all the drama" after he "had been through so much that day." The Appellant went to a gas station, bought a drink, went to his aunt's apartment, and fell asleep. The Appellant said that he did not call an ambulance for the victim because he was "frustrated."

The Appellant said that when Ms. Puryear called him, he told her that he did not know the victim's whereabouts. He denied telling Ms. Puryear that he had killed the victim, asserting that he knew the victim was not dead and that he had not been trying to kill her.

On cross-examination, the Appellant acknowledged that he had a prior conviction of theft of property over a thousand dollars. Regarding the knife, the Appellant explained that he had purchased the knife for the victim for protection. The victim usually kept the knife in the driver's side door; however, on the night of the incident, she took the knife from the back passenger door.

The jury found the Appellant guilty of the lesser-included offense of attempted second degree murder. The trial court sentenced the Appellant as a Range III, persistent offender to thirty years in the Tennessee Department of Correction. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his conviction, contending that the proof did not show he was aware his conduct was reasonably certain to result in the victim's death.

## II.  Analysis

On appeal, a jury conviction removes the presumption of the Appellant's innocence and replaces it with one of guilt, so that the Appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The Appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

"In order to convict a defendant of attempted second-degree murder, the state is required to prove that the [Appellant] acted with the intent to cause the knowing killing of another, believing his conduct would cause the result without further conduct on his part." State v. Inlow, 52 S.W.3d 101, 104 (Tenn. Crim. App. 2000) (citing Tenn. Code Ann. §§ 39-12-101(a)(2) and 39-13-210(a)). "Whether the [A]ppellant 'knowingly' attempted to kill his victim is a question of fact for the jury." Id. at 104-05. "'Intent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence.'" State v. Bonds, 502 S.W.3d 118, 145 (Tenn. Crim. App. 2016) (quoting Inlow, 52 S.W.3d at 105).

On appeal, the Appellant concedes that his actions were "deplorable." He contends, however, that the evidence was insufficient to sustain his conviction because no proof was adduced that the victim's injuries were life-threatening or that he "was aware that his conduct was reasonably certain to result in [the victim's] death." The State asserts that the proof was sufficient to sustain the Appellant's conviction. We agree with the State.

In the light most favorable to the State, the proof adduced at trial reveals that after the Appellant and the victim met each other at work, they began a romantic relationship. However, the Appellant wanted the relationship to progress too quickly for the victim's comfort, and she ended the relationship. Thereafter, on the night of October 17, the victim, the Appellant, and Mr. Frison left work together in her vehicle. When they stopped at a gas station, Mr. Frison went into the store. The Appellant drew a knife, ordered the victim to get into the backseat, and stabbed her three times in the neck, three times in the abdomen, and once in the back shoulder. During the stabbing, the Appellant told the victim to "[s]hut up" and threatened to "teach [her] a lesson." After the stabbing, the Appellant began driving out of the gas station parking lot and hit a car when the victim grabbed the steering wheel. While on the road, the Appellant and the victim continued to wrestle over the steering wheel. Eventually, the victim managed to jump into the front passenger seat, open the front passenger door, and run away. The Appellant caught her and picked her up, but when she feigned a seizure, he dropped her and left. The victim ran for help, leaving a trail of blood, until she found a security guard who

called 911. When the police and an ambulance arrived, the victim was taken to the hospital and immediately had surgery. The victim's recovery took months. Shortly after the incident, the Appellant told the victim's daughter that he had been upset with the victim and had killed her.

We conclude that the evidence is sufficient to support the conviction. The Appellant repeatedly stabbed the unarmed victim in the neck, back, shoulders, and abdomen. While stabbing the victim, the Appellant told her that he was going to teach her a lesson, then he later told the victim's daughter that he had killed the victim. A paramedic who treated the victim at the scene described finding the victim bleeding and in apparent distress from the seven stab wounds. The victim immediately underwent surgery and was left unable to care for herself for several months. Based on the evidence, the rational jury could have found beyond a reasonable doubt that the Appellant "acted with the intent to cause the knowing killing of [the victim], believing his conduct would cause [her death] without further conduct on his part." Inlow, 52 S.W.3d at 104; see Bonds, 502 S.W.3d at 145.

### III. Conclusion

We affirm the judgment of the trial court.

 

 

_____
NORMA MCGEE OGLE, JUDGE